JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN - 6 2007

FILED
CLERK'S OFFICE

# MDL 1869

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| In Re | ) |
| | ) |
| RAILROAD ANTITRUST LITIGATION | )    MDL Docket No. _1869_ |
| | ) |
| | ) |
| | ) |

## PLAINTIFF DUST PRO, INC.'S MOTION
## FOR TRANSFER OF RELATED ACTIONS FOR COORDINATED OR
## CONSOLIDATED PRETRIAL PROCEEDINGS PURSUANT TO 28 U.S.C. § 1407

Plaintiff and Movant Dust Pro, Inc. ("Dust Pro") respectfully moves the Panel for an

order, pursuant to 28 U.S.C. § 1407, transferring the case of Dad's Products Company, Inc. v.

BNSF Railway Company, et al, Case No. 07CV2954, which is currently pending in the Northern

District of Illinois, to the District of New Jersey for consolidation with two other earlier-filed and

virtually identical actions -- Dust Pro, Inc. v. CSX Transportation, Inc., Civil Action No. 07-

2251 (DMC), and Issac Industries, Inc. v. CSX Transportation, Inc., Civil Action No. 07-02289

(DMC) -- already pending in the District of New Jersey and assigned to the Honorable Dennis

M. Cavanaugh, U.S.D.J.

Each of the three cases is an antitrust class action brought against the five major US-

based railroads:  CSX Transportation, Inc. ("CSX"), BNSF Railway Company ("BNSF"), Union

Pacific Railroad Company ("UP"), Norfolk Southern Railway Company ("NS"), and Kansas City

# OFFICIAL FILE COPY

61042/2131525.1

Southern Railway Company ("KCS").  The plaintiffs in the Illinois case allege that they were

damaged by the same conduct and conspiracy that is alleged in the New Jersey cases.  Indeed,

Illinois "copycat" complaint is a virtual carbon copy of the Dust Pro complaint in the District of

New Jersey, which was the first filed case and which reflected significant factual and legal

investigation.  Given the identical nature of the allegations, causes of action, and questions of

fact in these cases, transfer and consolidation is appropriate and necessary to conserve the

resources of the parties, their counsel, and the judiciary; to prevent inconsistent pre-trial rulings;

and to avoid duplication of discovery.

Dust Pro submits that the most appropriate venue for these cases is the District of New

Jersey, in Newark, before Judge Cavanaugh.  New Jersey is where the first case was filed and

where two of the three cases are pending and already assigned to Judge Cavanaugh.  Judge

Cavanaugh is experienced in significant class action litigation and is not currently handling

another MDL proceeding.

The District of New Jersey is a logical and convenient forum for this litigation.  New

Jersey, and in particular the Newark area, is a genuine "nerve center" for the railway industry,

with billions of dollars of rail freight moving through the state each year.  Newark is a key point

of origination and termination for much of the defendants' rail freight traffic.  The defendants

own vast networks of tracks, stations, yards and switching facilities in the District, and northern

New Jersey is one of the national most important rail crossroads.  The defendants maintain

offices within the District.

Newark is home to a major international airport and is also one of the most convenient

and accessible venues in the nation.  The Panel has previously recognized this accessibility and

convenience.

Because it would be inefficient to carve out separate proceedings for the *Dad's* case in Illinois, which shares common questions of fact with the cases currently before Judge Cavanaugh, and because the District of New Jersey as logical and convenient forum as any for this litigation, Dust Pro respectfully proposes that the *Dad's* case be transferred to the Honorable Dennis M. Cavanaugh in the District of New Jersey.

Dust Pro also anticipates that other complaints may be filed containing similar allegations. Thus, Dust Pro requests that any such subsequently-filed actions be treated as tag-along actions under Rule 7.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, subject to consolidation in the same venue as these actions in order to "promote the just and efficient conduct of the cases." 28 U.S.C. § 1407.

A supporting brief is submitted herewith.

Dated:  June 1, 2007

Respectfully Submitted,

Stephen R. Neuwirth
Quinn Emanuel Urquhart Oliver&
   & Hedges, LLP
51 Madison Avenue
New York, New York  10010
(212) 849-7165
(212) 849-7100 (fax)

James E. Cecchi
Carella, Byrne, Bain, Gilfillan,
   Cecchi, Stewart & Olstein
5 Becker Farm Road
Roseland, New Jersey  07068
(973) 994-1700

Daniel Brockett
David Azar
Melissa Dalziel
Quinn Emanuel Urquhart Oliver
   & Hedges, LLP
865 S. Figueroa Street
Los Angeles, California 90017
(213) 443- 3000

Richard Scruggs
Sidney Backstrom
Scruggs Law Firm, P.A.

<u>120A Courthouse Square</u>

P.O. Box 1136
Oxford, MS 38655
(662) 281 1212

Paul Donovan
LaRoe, Winn, Moerman & Donovan
4135 Parkglen Court, N.W.
Washington, D.C. 20007
(202) 298-8100

*Attorneys For Plaintiff Dust Pro, Inc.*

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN ~ 6 2007

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

In Re                                    )
                                         )
RAILROAD ANTITRUST LITIGATION            )
                                         )        MDL Docket No. *1869*
                                         )
                                         )

### BRIEF IN SUPPORT OF PLAINTIFF DUST PRO, INC.'S
### MOTION FOR TRANSFER OF RELATED ACTIONS FOR COORDINATED OR
### CONSOLIDATED PRETRIAL PROCEEDINGS PURSUANT TO 28 U.S.C. § 1407

Pursuant to 28 U.S.C. § 1407, plaintiff Dust Pro, Inc. ("Dust Pro") respectfully moves

this Panel for transfer and consolidation of three separate antitrust class actions containing

virtually identical allegations of price fixing by the five major U.S.-based railroads.  The cases --

all of which name the same defendants -- are currently pending in two different districts (see

Appendix A, a summary of defendants and districts), and involve common questions of fact and

law concerning allegations that the defendant railroads conspired to fix prices of rail fuel

surcharges for rail freight transportation pursuant to private contracts and other means exempt

from federal rate regulation.  Dust Pro requests that the Panel transfer and consolidate all cases in

the District of New Jersey, where two of the three existing and virtually identical cases,

including the first-filed case, are currently pending.  Dust Pro respectfully submits that the

District of New Jersey is the most appropriate venue for the litigation.

RECEIVED CLERK'S OFFICE
2007 JUN - 1  P 4: 31

## I.    INTRODUCTION

On May 14, 2007, movant Dust Pro commenced its antitrust action, filing a complaint that reflected significant factual and legal investigation.  The case concerned the defendant railroads' imposition of fuel surcharges to freight transported pursuant to private contracts and other means exempt from federal regulation.  In January 2007, the federal Surface Transportation Board, which has jurisdiction limited to rate-regulated rail freight traffic, found that the defendants' fuel surcharges are an "unreasonable practice," and that they were used as a means to enhance revenue rather than recover the actual cost of fuel for particular freight shipments.  Dust Pro's case was assigned to the Honorable Dennis M. Cavanaugh, U.S.D.J.

Since Dust Pro's filing, a virtually identical complaint has been filed on behalf of another plaintiffs in the District of New Jersey.  This have been filed as a related case and has been assigned to Judge Cavanaugh.  Another virtually identical "copycat" complaint has subsequently been filed in the Northern District of Illinois.

Transfer of these virtually identical cases to a single forum for pre-trial proceedings is plainly necessary to conserve the resources of the parties, their counsel and the courts, to prevent inconsistent rulings in different forums, and to avoid duplication of discovery.

Dust Pro respectfully submits that the most appropriate venue for these cases is the District of New Jersey, in Newark, before Judge Cavanaugh.  Two of the three pending cases have been filed in that District and assigned to Judge Cavanaugh.  Judge Cavanaugh has already begun to familiarize himself with the issues in the case, and has stated his intention to schedule an initial case management conference at the "earliest possible date."  Judge Cavanaugh is well experienced in significant class action litigation, but at the same time is not currently burdened by an MDL proceeding.

Newark, New Jersey, is also as logical a forum as any other for this litigation. New Jersey, and in particular the Newark area, is a genuine "nerve center" for the railway industry, with billions of dollars of rail freight each year. Newark is a key point of origination and termination for much of the rail freight that travels across multiple defendants' rail lines. The defendants own vast networks of tracks, stations, yards and switching facilities in the district, and Northern New Jersey is one of the nation's most important rail crossroads. It is not surprising that the defendants maintain offices within the District.

Newark is also proximate to Washington, D.C., the headquarters of the Association of American Railroads (the "AAR"), the organization that is alleged (in all of the pending suits) to have been a principal vehicle through which the defendants developed and implemented their price fixing conspiracy. The AAR will likely be a very significant third party in the litigation, and a principal focus of the document and deposition discovery.

Newark, with its major international airport and passenger train connections, is also one of the most convenient and accessible venues in the nation, and this Panel has previously recognized that accessibility.

## II.   FACTUAL BACKGROUND

### A.   Procedural History

On May 14, 2007, Dust Pro filed its Complaint in the District of New Jersey (Civil Action No. 07-02251 (DMC)). Dust Pro's Complaint is a detailed and comprehensive document, reflecting significant factual and legal investigation. The Dust Pro case was assigned to Judge Dennis M. Cavanaugh. The very next day, Issac Industries, Inc. filed a virtually identical class action against the same defendant railroads (Civil Action No. 07-02289 (DMC)). This Issac Complaint was filed in the District of New Jersey and was also assigned to Judge Cavanaugh as a case related to Dust Pro's action.

On May 25, 2007, Dad's Products Company, Inc. ("Dad's") filed another virtually identical, "copycat" class action against the same group of defendants in the Northern District of Illinois, Eastern Division (Case No. 07CV2954). The *Dad's* action has been assigned to Judge Samuel Der-Yeghiayan.

**B.     The Complaints**

Dust Pro's complaint, and the two virtually identical complaints that followed, charge the five major US-based railroad freight haulers with price fixing in violation of Section 1 of the Sherman Act. The Complaints center on the same key factual allegations – that since July 2003, the railroads have conspired to fix, maintain or stabilize prices of rail fuel surcharges imposed on rail freight transportation pursuant to private contracts and other means exempt from federal rate regulation. These private rail contracts and other exempt means constitute the majority of freight shipments. When the federal Surface Transportation Board (the "STB") in January 2007 found the railroad's freight surcharges to be an "unreasonable practice" used to raise revenue rather than recover actual fuel costs, the STB noted that its jurisdiction is limited to rate regulated freight traffic and does not reach the private contracts and exempt traffic that are the subject of the Dust Pro complaint and the other virtually identical pending actions.

The cases are brought on behalf of all companies that directly purchased rate-unregulated rail freight transport services from defendants since mid-2003 and who were assessed a rail fuel surcharge. The Dust Pro complaint, and the two other virtually identical complaints filed thereafter, all have the identical class definition. *See* Dust Pro. Compl., ¶¶ 1-2; Issac Compl., ¶¶ 1-2; Dad's Compl., ¶¶ 1-4.

## III.   ARGUMENT

**A.    Consolidating The Three Railroad Antitrust Cases
Will Achieve The Objectives Of Section 1407.**

### 1.    The Cases Involve Identical Factual and Legal Issues.

These cases are all brought against the same five defendants:  CSX Transportation, Inc.

("CSX"), Norfolk Southern Railway Company ("NS"), BNSF Railway Company ("BNSF"),

Union Pacific Railroad Company ("UP"), and Kansas City Southern Railway Company

("KCS").  Each complaint states the same allegation – that the defendants violated the Sherman

Act by fixing the prices of rail fuel surcharges.  Each complaint, as noted above, also defines the

class in exactly the same way.  The cases differ only in the named class representative.  The fact

that all of the cases share the same parties and claims creates numerous common factual issues.

Indeed, each complaint uses the identical language to describe the common questions of law and

fact, which "exist as to all members of the Class" and "which predominate over any questions

affecting solely individual members of the class."  (*See* Dust Pro Compl., ¶ 23; Issac Compl., ¶

23; Dad's Compl., ¶ 24).

The complaints also plead the same cause of action for violation of § 1 of the Sherman

Act, and seek the identical relief.  (*See* Dust Pro Compl., ¶¶ 69-73, Prayer for Relief; Issac

Compl., ¶¶ 69-74, Prayer for Relief; Dad's Compl., ¶¶ 72-77, Prayer for Relief).

Where antitrust class actions involve common questions of fact, this Panel has frequently

found that "centralization under Section 1407 will serve the convenience of the parties and

witnesses and promote the just and efficient conduct of this litigation" and is "necessary in order

to avoid duplication of discovery, prevent inconsistent or repetitive pretrial rulings, and conserve

the resources of the parties, their counsel and the judiciary."  *In re Visa/MasterCard Antitrust

Litigation*, 295 F.Supp.2d 1379, 1380 (Jud.Pan.Mult.Lit. 2003).

## 2.   The Complaints Are Brought On Behalf Of An Identical Class of Plaintiffs.

Where several actions have been brought on behalf of similar or overlapping classes of plaintiffs, this Panel has found compelling justification for transfer and consolidation of the actions. It is obviously desirable to have a single judge oversee multiple but identical class actions in order to avoid duplicative efforts and inconsistent rulings. *See In re Resource Exploration, Inc., Securities Litigation*, 483 F.Supp. 817, 821 (Jud.Pan.Mult.Lit. 1980); *In re National Airlines, Inc. Maternity Leave Practices and Flight Attendant Weight Program Litigation*, 399 F.Supp. 1405, 1407 (Jud.Pan.Mult.Lit. 1975) (holding that need to eliminate possibility of overlapping class determinations presents compelling reason to bring actions pending in different districts together for pretrial in single jurisdiction); *In re First Nat. Bank, Heavener, Okl. (First Mortg. Revenue Bonds) Securities Litigation*, 451 F.Supp. 995, 997 (Jud.Pan.Mult.Lit. 1978) ("Because these actions have been brought on behalf of the same plaintiff class, we emphasize that it is desirable to have a single judge oversee the class action issues in both actions to avoid duplicative efforts in this area.").

## 3.   Transfer Is Necessary To Conserve The Resources of the Parties, Counsel, and Judiciary.

Unquestionably, these cases involve identical issues. It would be a waste of judicial resources to have multiple judges addressing them simultaneously. It would be equally wasteful to have the parties and their counsel litigating the same issues in multiple fora. The documents and witness are common to all actions, with the exception of the named plaintiffs. A uniform case management and discovery plan will save all parties and the courts both time and money. *See In re Peruvian Road Litigation*, 380 F. Supp. 796, 798 (Jud.Pan.Mult.Lit. 1974) ("Although only a limited number of actions are involved in this litigation, . . . [t]he factual allegations in all

actions are inextricably intertwined and raise sufficiently complex factual issues . . . to warrant

transfer.")

### 4.      Transfer Is Necessary To Coordinate Discovery and Avoid Inconsistent Rulings.

Price fixing cases have repeatedly been found by the Panel to be appropriate for

consolidation to eliminate duplicative discovery and prevent inconsistent pretrial rulings. *See In*

*re Intern. Air Transp. Surcharge Antitrust Litigation*, 460 F.Supp.2d 1377 (Jud.Pan.Mult.Lit.

2006); *In re Parcel Tanker Shipping Services Antitrust Litigation*, 296 F.Supp.2d 1370

(Jud.Pan.Mult.Lit. 2003). *See also In re Peruvian Road Litigation*, 380 F. Supp. at 798 (transfer

was necessary to "eliminate the possibility of inconsistent decisions").

The cases already filed demonstrate the need for a coordinated discovery plan. Absent

transfer, discovery will be overlapping and duplicative, proceeding with different schedules and

deadlines in different courts. Coordinated and consolidated proceedings, by contrast, will further

the convenience of the parties and conserve judicial resources.

### B.      The Pending Actions, and Any Tag-Along Cases Filed in the Future, Should All Be Assigned to Judge Cavanaugh in the District of New Jersey, and the Action Now Pending in the Northern District of Illinois Should Be Transferred to That Court.

### 1.      New Jersey is a Nerve Center for Rail Freight Transport, and The Location of Parties, Documents and Witnesses All Support Venue in New Jersey.

New Jersey, and in particular the Newark area where Judge Cavanaugh sits, is one of the

key "nerve centers" in the nation for rail freight transportation. The defendants maintain offices

and major operations in the District of New Jersey, including the Newark area:

- Defendant CSX maintains business offices in Kearney, New Jersey, and operates and/or

  serves rail terminals in the cities of Port Newark, Newark, Jersey City, Elizabeth, North

  Bergen, Kearney and Ridgefield, through which CSX originates and terminates rail

  traffic.

- Defendant NS maintains business offices in Jersey City, New Jersey, and operates and/or serves rail terminals in the cities of Port Newark, Newark, Jersey City and Elizabeth, through which NS originates and terminates rail traffic.

- CSX and NS together jointly own Conrail, which acts as a switching carrier for CSX and NS and operates almost 200 miles of rail lines in the Northern New Jersey. The hub of Conrail activities in the region is the Oak Island Yard in Newark, with small local serving yards throughout Northern New Jersey.

- Together, CSX and NS move all rail traffic into and out of the New Jersey/New York area. The vast majority of that traffic originates or terminates within northern New Jersey, and in the environs of Newark. For example, each year CSX and NS handle to and from the Newark area tens of thousands of carloads of various commodities, such as chemicals, and merchandise freight. Additionally, with respect to container (or "intermodal") traffic, in 2006 CSX and NS handled 339,000 containers at on-dock rail facilities in Newark, and also handled an additional 100,000-plus containers moving in domestic service through other rail terminals in the Newark area.

- Defendant BNSF's wholly-owned subsidiary, MBSF Logistics, LLC, maintains business offices in Williamstown, New Jersey. BNSF also originates and terminates rail traffic in New Jersey by providing transportation in interchange service with CSX and NS.

- Defendant UP maintains at least one employee or agent in the District of New Jersey. UP originates and terminates rail traffic within New Jersey by providing transportation in interchange service with CSX and NS.

- Defendant KCS also originates and terminates traffic within the District of New Jersey by providing rail transportation in interchange service with CSX and NS.

It is also particularly significant that Newark, New Jersey is in close proximity to, and within easy rail or auto travel from, Washington, D.C., the home of the Association of American Railroads – the organization that all of the actions allege was a principal vehicle through which the defendants developed and implemented their price-fixing conspiracy. Each of the defendants is a member of the AAR; each of the defendants' is represented on the AAR board; and the complaints allege that the defendants dominate the organization. The complaints note, by way of example, that the AAR was the body through which defendants announced that fuel would be removed from the standard rate escalation provision applied to private freight transportation contracts – a critical step in imposing the fuel surcharges at issue. The complaints also explain how the AAR is a means of regular communication among the defendants and their senior officers. It is inevitable that the AAR will be a key third party witness in the litigation, and that the AAR will be a major focus of discovery.

Certainly, in all of the foregoing respects, New Jersey is as appropriate a forum as any other, and in many respects a more appropriate forum than the Northern District of Illinois.

### 2. Judge Cavanaugh Is Experienced In Antitrust Litigation And Is Not Currently Assigned to Any MDL Actions.

One factor this Panel considers in determining the preferable transferee district is "the experience, skill, and caseloads of available judges." MANUAL FOR COMPLEX LITIGATION (4th Ed.), § 20.131, at 221. Judge Cavanaugh is well qualified to handle class actions, including on antitrust issues, having previously managed numerous such cases. *See e.g., Danvers Motor Co., Inc. v. Ford Motor Co.*, Civil Action No. 02-2197 (2007) (class action asserting violations of Robinson-Patman Act); *Desantis v. Snap-On Tools Co., LLC*, Civil Action No. 06-2231 (2007) (class action); *Desantis v. Snap-On Tools Co., LLC*, Civil Action No. 06-2231 (2006) (class action asserting deceptive business practices); *Weiss v. Regal Collections*, Civil Action No. 01-

9

881 (2006) (class action for violations of Fair Debt Collection Practices Act); *Simon v. KPMG LLP*, Civil Action No. 05-3189 (2006) (class action against tax advisors for bad tax advice); *Poling v. K. Hovnanian Enterprises*, Civil Action No. 99-431 (2000) (action for violation of Sherman Act, Rico, and Securities Exchange Act).  Notably, prior to Judge Cavanaugh's appointment as a District Judge in 2000, he served as a Magistrate Judge in the District of New Jersey from 1993, where his primary civil responsibilities included the management of complex litigation.

While the "Distribution of Pending MDL Dockets" shows that this Panel has recently approved of the District of New Jersey as a suitable MDL venue in 14 still pending cases of national significance, *see* <www.jpml.uscourts.gov/Pending_MDLs/PendingMDL-May007.pdf>, Judge Cavanaugh is not currently assigned any of these pending MDL matters.

3.   **The District of New Jersey Is Experienced
     In Managing Multi-District Litigation.**

This Panel has frequently found that the District of New Jersey possesses the experience, sophistication, and resources needed for complex, multi-district antitrust actions. *See, e.g., In re Insurance Brokerage Antitrust Litigation*, 360 F.Supp.2d 1371, 1373 (Jud.Pan.Mult.Lit. 2005) ("the district is equipped with the resources that this complex antitrust docket is likely to require."); *In re Hypodermic Products Antitrust Litigation*, 408 F.Supp.2d 1356, 1357 (Jud.Pan.Mult.Lit. 2005) (same).

As noted above, the Distribution of Pending MDL Dockets reveals that the Panel has recently approved of the Distrct of New Jersey as a suitable MDL venue in 14 still-pending cases of national significance. *See* <www.jpml.uscourts.gov/Pending_MDLs/PendingMDL-May007.pdf>.

4.     **The District of New Jersey Is Readily Accessible
          and a Major Transportation Hub.**

This Panel's rulings have also recognized that Newark is "an accessible metropolitan

location." *See, e.g., In re Insurance Brokerage Antitrust Litigation*, 360 F.Supp.2d at 1373.

With a major international airport offering frequent direct flights throughout the United States,

and with regular passenger train service, Newark is as readily accessible to all of the parties as

any other city.  Moreover, as compared to the Northern District of Illinois, the District of New

Jersey offers the advantage of ready access to Washington, D.C., where key third party the AAR

is headquartered.

C.     **Any Subsequently Filed Tag-Along Actions Should Be
          Transferred To The District Of New Jersey.**

Dust Pro anticipates that additional "copycat" complaints may be filed in the coming

weeks.  Dust Pro respectfully requests that any such subsequently filed actions be treated as tag-

along actions under Rule 7.4 of the Rules of Procedure of the Judicial Panel on Multidistrict

Litigation, subject to consolidation in the same venue as these actions in order to "promote the

just and efficient conduct of the cases." 28 U.S.C. § 1407.

## IV.     CONCLUSION

For the foregoing reasons, Dust Pro respectfully submits that the Panel should order that

all of the pending actions be consolidated before, and where necessary transferred to, the

Honorable Dennis M. Cavanaugh in the District of New Jersey for coordinated and consolidated

pretrial proceedings.  These cases involve "common questions of fact" and transfer would be "for

the convenience of parties and witnesses" and would "promote the just and efficient conduct" of

the actions.  28 U.S.C. § 1407; *see, e.g., In re Hypodermic Products Antitrust Litigation*, 408

F.Supp.2d 1356, 1357 (Jud.Pan.Mult.Lit. 2005) (finding that the actions "involve common

questions of fact, and that centralization under Section 1407 in the District of New Jersey will

serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation").

Dated: June 1, 2007

Respectfully submitted,

*Stephen R. Neuwirth*

James E. Cecchi
Carella, Byrne, Bain, Gilfillan,
   Cecchi, Stewart & Olstein
5 Becker Farm Road
Roseland, New Jersey  07068
(973) 994-1700

Stephen R. Neuwirth
Quinn Emanuel Urquhart Oliver&
   & Hedges, LLP
51 Madison Avenue
New York, New York  10010
(212) 849-7165
(212) 849-7100 (fax)

Daniel Brockett
David Azar
Melissa Dalziel
Quinn Emanuel Urquhart Oliver
   & Hedges, LLP
865 S. Figueroa Street
Los Angeles, California 90017
(213) 443- 3000

Richard Scruggs
Sidney Backstrom
Scruggs Law Firm, P.A.
**120A Courthouse Square**
P.O. Box 1136
Oxford, MS 38655
(662) 281 1212

Paul Donovan
LaRoe, Winn, Moerman & Donovan
4135 Parkglen Court, N.W.
Washington, D.C. 20007
(202) 298-8100

*Attorneys For Plaintiff Dust Pro, Inc.*

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN - 6 2007

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | | |
|---|---|---|
| In Re | ) | |
| | ) | |
| RAILROAD ANTITRUST LITIGATION | ) | MDL Docket No. _1869_ |
| | ) | |
| | ) | |
| | ) | |

## Revised Schedule of Actions[1]

### The District of New Jersey Actions

**Dust Pro, Inc. v. CSX Transportation, et al.**

| | |
|---|---|
| Plaintiff: | Dust Pro, Inc., on behalf of itself and all others similarly situated |
| Defendants: | CSX Transportation, Inc., BNSF Railway Company, Union Pacific Railroad Company, Norfolk Southern Railway Company, Kansas City Southern Railway Company |
| District Court: | District of New Jersey |
| Civil Action No.: | 07-02251 (DMC) |
| Judge: | Hon. Dennis M. Cavanaugh |
| Cause of Action: | Violation of § 1 of the Sherman Act and § 4 of the Clayton Act |
| Type of Complaint: | Class Action, Demand for Jury Trial |

**Issac Industries, Inc. v. CSX Transportation, et al.**

| | |
|---|---|
| Plaintiff: | Issac Industries, Inc., on behalf of itself and all others similarly situated |
| Defendants: | CSX Transportation, Inc., BNSF Railway Company, Union Pacific Railroad Company, Norfolk Southern Railway Company, Kansas City Southern Railway Company |
| District Court: | District of New Jersey |
| Civil Action No.: | 07-02289 (DMC) |
| Judge: | Hon. Dennis M. Cavanaugh |

---

[1]  The Docket Sheets for each action are attached hereto.

RECEIVED CLERK'S OFFICE
2007 JUN -5 A 10:38
JUDICIAL PANEL ON

Cause of Action:       Violation of § 1 of the Sherman Act and § 4 of the Clayton Act
Type of Complaint:     Class Action, Demand for Jury Trial


## The Northern District of Illinois Action

### Dad's Products Company, Inc. v. CSX Transportation, et al.

Plaintiff:             Dad's Products Company, Inc., on behalf of itself and all others similarly
                       situated
Defendants:            BNSF Railway Company, CSX Transportation, Inc., Kansas City
                       Southern Railway Company, Norfolk Southern Railway Company, Union
                       Pacific Railroad Company
District Court:        Northern District of Illinois, Eastern Division
Civil Action No.:      1:07-cv-02954
Judge:                 Hon. Samuel Der-Yeghiayan
Cause of Action:       Violation of § 1 of the Sherman Act and § 4 of the Clayton Act
Type of Complaint:     Class Action, Demand for Jury Trial


Dated: June 4, 2007

Respectfully submitted,

/SHR by permission

Stephen R. Neuwirth

James E. Cecchi                          Quinn Emanuel Urquhart Oliver&
Carella, Byrne, Bain, Gilfillan,            & Hedges, LLP
    Cecchi, Stewart & Olstein            51 Madison Avenue
5 Becker Farm Road                       New York, New York 10010
Roseland, New Jersey 07068               (212) 849-7165
(973) 994-1700                           (212) 849-7100 (fax)

                                         Daniel Brockett
                                         David Azar
                                         Melissa Dalziel
                                         Quinn Emanuel Urquhart Oliver
                                            & Hedges, LLP
                                         865 S. Figueroa Street
                                         Los Angeles, California 90017
                                         (213) 443- 3000

                                         Richard Scruggs
                                         Sidney Backstrom
                                         Scruggs Law Firm, P.A.
                                         **120A Courthouse Square**
                                         P.O. Box 1136
                                         Oxford, MS 38655
                                         (662) 281 1212

Paul Donovan
LaRoe, Winn, Moerman & Donovan
4135 Parkglen Court, N.W.
Washington, D.C. 20007
(202) 298-8100

*Attorneys For Plaintiff Dust Pro, Inc.*

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN - 6 2007

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

In Re                                          )
                                               )
RAILROAD ANTITRUST LITIGATION                  )
                                               )          MDL Docket No. _1869_
                                               )
_____)

<u>**CERTIFICATE OF SERVICE**</u>

Shahreen Mehjabeen, being duly sworn, deposes and says:

      1.     I am not a party to this action, am 18 years of age or older, and reside at Queens,

New York.

      2.     On June 1, 2007, I am causing true and correct copies of

- Plaintiff Dust Pro, Inc.'s Motion For Transfer Of Related Actions For Coordinated or Consolidated Pretrial Proceedings Pursuant To 28 U.S.C. § 1407

- Brief In Support of Plaintiff Dust Pro, Inc.'s Motion For Transfer Of Related Actions For Coordinated or Consolidated Pretrial Proceedings Pursuant To 28 U.S.C. § 1407

- Exhibits Submitted With Brief In Support Of Plaintiff Dust Pro, Inc.'s Motion For Transfer Of Related Actions For Coordinated or Consolidated Pretrial Proceedings Pursuant To 28 U.S.C. § 1407

- Schedule of Actions

to be served by Federal Express overnight delivery on the following addressees:

Robert N. Kaplan
Linda P. Nussbaum
Kaplan Fox & Kilsheimer L.L.P.
805 Third Avenue, 22nd Floor
New York, NY 10022

2007 JUN -1 P 4: 32
RECEIVED
CLERK'S OFFICE
JUDICIAL PANEL ON

Tel: 212-687-1980
Attorneys for Isaac Industries, Inc.

Michael E. Criden
Kevin B. Love
Hanzman, Criden & Love, P.A.
7301 S.W. 57th Street, Suite 515
South Miami, Florida 33143
Tel: 305-357-9000
Attorneys for Isaac Industries, Inc.

Lisa Rodriguez
Trujillo Rodriguez & Richards L.L.C.
8 Kings Highway West
Haddonfield, New Jersey 08033
Tel: 856-795-9002
Attorneys for Isaac Industries, Inc.

Gary A. Winters
Mayer, Brown, Rowe, Maw LLP
1909 K Street N.W.
Washington, DC 20006
Tel: 202-263-3000
Attorneys for BNSF Railway Company

Reid L. Sahinoff
Sonnenschein Nath & Rosenthal LLP
1221 Avenue of the Americas
New York, NY 10020
Tel: 212-768-6700
Attorneys for Kansas City Southern Railway Company

John M. Nannes
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue N.W.
Washington, D.C. 20005
Tel: 202-371-7000
Attorneys for Norfolk Southern Railway Company

Kent A. Gardiner
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel: 202-624-2578
Attorneys for CSX Transportation Inc.

Alan M. Wiseman
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel: 202-783-0800
Attorneys for Union Pacific Railroad Company

Carol V. Gilden
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
39 S LaSalle Street, Suite 1100
Chicago, Illinois 60603
Tel: 312-357-0370
Attorneys for Dad's Products Company, Inc.

Michael D. Hausfeld
Benjamin D. Brown
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005
Tel: 202-408-4600
Attorneys for Dad's Products Company, Inc.

Steig D. Olson
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
150 East 52nd Street, Thirtieth Floor
New York, NY 10022
Tel: 212-838-7797
Attorneys for Dad's Products Company, Inc.

Arthur N. Bailey
Arthur N. Bailey & Associates
111 West Second Street, Suite 4500
Jamestown, NY 14701
Tel: 716-664-2967
Attorneys for Dad's Products Company, Inc.

3.   On June 1, 2007, I am causing true and correct copies of

- Plaintiff Dust Pro, Inc.'s Motion For Transfer Of Related Actions For Coordinated or Consolidated Pretrial Proceedings Pursuant To 28 U.S.C. § 1407

- Brief In Support of Plaintiff Dust Pro, Inc.'s Motion For Transfer Of Related Actions For Coordinated or Consolidated Pretrial Proceedings Pursuant To 28 U.S.C. § 1407

- Exhibits Submitted With Brief In Support Of Plaintiff Dust Pro, Inc.'s Motion For Transfer Of Related Actions For Coordinated or Consolidated Pretrial Proceedings Pursuant To 28 U.S.C. § 1407

3

-   Schedule of Actions

to be delivered for filing to the Clerk of the United States District Court for the District of New Jersey and the Clerk of the United States District Court for the Northern District of Illinois.

Shahreen Mehjabeen

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN ~ 6 2007

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

In Re                                                )
                                                     )
RAILROAD ANTITRUST LITIGATION         )
                                                     )          MDL Docket No. _____
                                                     )
                                                     )
_____)

## EXHIBITS SUBMITTED WITH
### BRIEF IN SUPPORT OF PLAINTIFF DUST PRO, INC.'S
### MOTION FOR TRANSFER OF RELATED ACTIONS FOR COORDINATED OR
### CONSOLIDATED PRETRIAL PROCEEDINGS PURSUANT TO 28 U.S.C. § 1407

James E. Cecchi
Carella, Byrne, Bain, Gilfillan,
    Cecchi, Stewart & Olstein
5 Becker Farm Road
Roseland, New Jersey  07068
(973) 994-1700

Stephen R. Neuwirth
Quinn Emanuel Urquhart Oliver&
    & Hedges, LLP
51 Madison Avenue
New York, New York  10010
(212) 849-7165
(212) 849-7100 (fax)

*Attorneys For Plaintiff Dust Pro, Inc.*

2007 JUN -1  P 4: 31
JUDICIAL PANEL ON
RECEIVED
CLERK'S OFFICE

Exhibit A

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN
5 Becker Farm Road
Roseland, New Jersey  07068
(973) 994-1700

Daniel Brockett
David Azar
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
865 S. Figueroa Street
Los Angeles, California 90017
(213) 443- 3000

Richard Scruggs
Sidney Backstrom
SCRUGGS LAW FIRM, P.A.
120A Courthouse Square
P.O. Box 1136
Oxford, MS 38655
(662) 281 1212

Stephen Neuwirth
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7100

Paul Donovan
LAROE, WINN, MOERMAN &
DONOVAN
4135 Parkglen Court, N.W.
Washington, D.C. 20007
(202) 298-8100

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DUST PRO, INC., on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CSX TRANSPORTATION, INC., BNSF RAILWAY COMPANY, UNION PACIFIC RAILROAD COMPANY, NORFOLK SOUTHERN RAILWAY COMPANY, AND KANSAS CITY SOUTHERN RAILWAY COMPANY,<br><br>Defendants. | Civil Action No.<br><br><br><br>**CLASS ACTION COMPLAINT and DEMAND FOR JURY TRIAL** |

Plaintiff Dust Pro, Inc. ("Dust Pro" or "Plaintiff"), an Arizona corporation located in Phoenix, Arizona, individually and on behalf of a class of all those similarly situated, brings this action for damages under the antitrust laws of the United States against Defendants, and alleges as follows:

## NATURE OF THE ACTION

1.     This is an antitrust class action charging five United States based Class I railroads with price fixing in violation of Section 1 of the Sherman Act.  Plaintiff brings this action on behalf of itself and an alleged class of direct purchasers who purchased unregulated rail freight transportation services from Defendants and their co-conspirators from July 1, 2003 to the present (the "Class Period," which will also include the period from the date of this filing to the date of class notice) and who were assessed a rail fuel surcharge for the agreed-upon transportation.  As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.  Defendants collectively control over 90 percent of the rail freight traffic in the United States.

2.     Plaintiff alleges that during the Class Period, defendant railroads conspired to fix, raise, maintain, or stabilize prices of rail freight transportation services sold in the United States through use of rail fuel surcharges added to customers' bills.  A rail fuel surcharge ("Rail Fuel Surcharge") is a separately-identified fee that is charged by the railroads for the agreed-upon transportation, purportedly to compensate for increases in the cost of fuel.  Throughout the Class Period, Defendants maintained uniformity of prices in Rail Fuel Surcharges by computing the surcharges as a percentage of the rail freight transport base rate and by agreeing upon common indices and trigger points for adjusting the percentages monthly.  Defendants also published their Rail Fuel Surcharges on their websites to facilitate coordination and the detection of any deviation from collusive pricing.

3.      As a direct and proximate result of this price fixing conspiracy, Defendants have restrained competition in the market for unregulated rail freight transportation services and injured plaintiff and each Class member in their business and property.  Plaintiff and the members of the Class each have paid a higher price for unregulated rail freight transportation than they would have paid absent the concerted unlawful activity alleged herein.

4.      Plaintiff seeks damages on behalf of itself and the Class for Rail Fuel Surcharges imposed on rail freight shipments made under private transportation contracts and through other means exempt from rate regulation under federal law.  Plaintiff does not seek, on behalf of itself or the Class, damages or relief arising from fuel surcharges imposed on rate-regulated freight transportation.

**PARTIES**

5.      Plaintiff Dust Pro, Inc. is a corporation organized under the laws of the State of Arizona, with its principal place of business at 3224 West Brown Street, Phoenix, Arizona, 85034.

6.      During the class period, Dust Pro manufactured and distributed soil stabilizers.

7.      Dust Pro purchased unregulated rail freight transportation directly from one or more of the Defendants during the Class Period, and during the Class Period one or more of the Defendants assessed Rail Fuel Surcharges on plaintiff in connection with that unregulated rail freight transportation.  The prices plaintiff paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices plaintiff would have paid absent the conspiracy alleged herein.  Plaintiff has therefore been injured in its business and property by reason of Defendants' antitrust violations.  Plaintiff asserts its claims on behalf of itself and all direct purchasers of unregulated rail freight transportation services from one or more of the Defendants, and as to which Defendants imposed Rail Fuel Surcharges, during the Class Period.

3

8.      Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202. In New Jersey, CSX maintains business offices at 1 Pennsylvania Ave, Kearny, New Jersey 07032. CSX also operates and/or serves rail terminals in the cities of Port Newark, Newark, Jersey City, Elizabeth, North Bergen, Kearny and Ridgefield, through which it originates and terminates rail traffic within this District. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States.

9.      Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. In New Jersey, NS maintains business offices at 125 County Road, Jersey City, New Jersey 07307. NS also operates and/or serves rail terminals in the cities of Port Newark, Newark, Jersey City and Elizabeth through which NS originates and terminates rail traffic within the District. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world.

10.      Defendants CSX and NS jointly own Conrail, which acts as a switching carrier for CSX and NS and operates almost 200 miles of rail lines in the northern half of New Jersey. The hub of Conrail activities in the region is Oak Island Yard in Newark, with smaller local serving yards in Bayonne, Greenville (Jersey City), Linden, Manville, Metuchen, Old Bridge, Port Reading (Woodbridge), Red Bank, and Newark.

11.      Together, CSX and NS move all rail traffic into and out of the New Jersey/New York area. The vast majority of that traffic originates or terminates within northern New Jersey, and in the environs of Newark. For example, each year CSX and NS handle to and from the Newark area tens

4

of thousands of carloads of various commodities, such as chemicals, and merchandise freight. Additionally, with respect to container (or "intermodal") traffic, in 2006 CSX and NS handled 339,000 containers at ExpressRail, the on-dock rail facilities in Newark. CSX and NS also handled an additional 100,000 plus containers moving in domestic service through other rail terminals in the Newark area.

12.      Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas  76131.  In New Jersey, BNSF's wholly-owned subsidiary, BNSF Logistics, LLC, maintains business offices at 375 N. Main Street, Suite C-1, Williamstown, New Jersey  08094.  BNSF also originates and terminates rail traffic within the District by providing transportation in interchange service with CSX and NS.  BNSF is a wholly owned subsidiary of the Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation.  BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states.

13.      Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska  68179.  In New Jersey, UP maintains at least one employee or agent, though the business address is currently unknown.  UP also originates and terminates rail traffic within this District by providing transportation in interchange service with CSX and NS.  UP is the largest freight railroad in the United States.  UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including New Jersey).

14.     Defendant Kansas City Southern Railway Company ("KCS") has its principal place of business at 427 W. 12th St., Kansas City, Missouri  64105.  In New Jersey, KCS maintains business offices at 1 Executive, Somerset, New Jersey  08873.  It also originates and terminates traffic within this District by providing rail transportation in interchange service with CSX and NS. KCS operates a major freight railroad in ten central and southeastern states.

## JURISDICTION AND VENUE

15.     This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15 , to recover treble damages and reasonable attorneys fees from Defendants for the injuries sustained by Plaintiff and members of the Class by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

16.     Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

17.     Venue is proper in the District of New Jersey pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391.  Defendants maintain offices, have agents, transact business, and are found within this judicial District; a substantial part of the events giving rise to the claim for relief occurred in this District; and Defendants regularly and continuously conduct business in interstate commerce that is carried out in part in this District.

18.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action under Rules 23(a), (b)(2) and 23(b)(3) of

the Federal Rules of Civil Procedure, on behalf of itself and others similarly situated.  The "Class"

is defined as:

> All purchasers of rail freight transportation services from Defendants
> (the "Class"), through use of private railroad-shipper contracts or
> through other means exempt from rate regulation under federal law,
> as to which Defendants assessed a Rail Fuel Surcharge, at any time
> from at least as early as July 2003 to the present (the "Class Period").
> Excluded from the Class are Defendants, any subsidiaries or affiliates
> of Defendants, and any of Defendants' co-conspirators, whether or
> not named as a Defendant in this Complaint.

20.     The Class is so numerous that joinder of all members is impracticable.  Given the

magnitude of the commerce involved, the members of the Class are geographically dispersed, and

joinder of all class members would be impracticable.  While the exact number of Class members is

unknown to plaintiff at this time, plaintiff believes that there are, at a minimum, thousands of

members of the Class and that their identities can be readily ascertained from Defendants' books and

records.

21.     Plaintiff's claims are typical of the claims of the other members of the Class.  Plaintiff

and all members of the Class directly purchased unregulated rail freight transportation from

Defendants, with respect to which Defendants imposed the artificially inflated Rail Fuel Surcharges

established and maintained by the actions of Defendants in connection with the restraint of trade

alleged herein.  Plaintiff and the members of the Class have all sustained damage in that they paid

inflated prices for the unregulated rail freight transportation services at issue as a result of

Defendants' conduct in violation of federal law.

22.     Plaintiff will fairly and adequately protect the interests of the members of the Class

and have retained counsel competent and experienced in class action and antitrust litigation.

23.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     Whether Defendants conspired, contracted or combined with others, for the purpose of and with the effect of raising, fixing, maintaining, pegging, or stabilizing the price of Rail Fuel Surcharges applied to unregulated rail freight transportation services  purchased by the Class;

b.     Whether Defendants undertook actions to conceal the unlawful conspiracies, contracts or combinations described herein;

c.     Whether Defendants' conduct violated the federal antitrust laws; and

d.     Whether Defendants' conduct caused injury to the business and property of plaintiff and the Class and, if so, the proper measure of damages.

24.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

25.     The interests of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Class has a strong and pervasive community of interest, and prosecution of the action through representatives would be unobjectionable.  The

amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants.   No difficulty is anticipated in the management of this action as a class action.

## INTERSTATE TRADE AND COMMERCE

26.    During the Class Period, Defendants accounted for over 90 percent of all rail shipments within the United States.  The US market for rail transportation services is estimated at more than $51 billion in 2006.

27.    The activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate and international commerce.  During the Class Period, Defendants and their co-conspirators sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States.  Each Defendant and their co-conspirators used instrumentalities of interstate or foreign commerce (or both) to sell and market rail freight transportation services.

28.    The unlawful activities of Defendants and the unnamed co-conspirators have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

## DEREGULATION OF THE RAILROAD INDUSTRY

29.    Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980.  This landmark legislation marked a dramatic change in the evolution of U.S. railroads.  After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

30.    Prior to the Staggers Act, the Interstate Commerce Commission ("ICC") prohibited railroads from charging rates different from those contained in published tariffs filed by the railroads with the ICC.  Today, however, 80 percent or more of all rail shipments are exempt from rate regulation or move under private transportation contracts, which are likewise free of rate regulation.

31. Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities). Five of these railroads -- the Defendants in this case -- operate more than 90 percent of all railroad track in the U.S. and account for more than $51 billion in total revenue.

32. Rail freight shippers across the nation are being subjected to an endless string of rate increases by railroads made possible by a concentrated market structure, tight capacity, and coordinated pricing. Although the reason for deregulation of the railroad industry was to promote competition and lower freight rates, it is now clear that the opposite has come true – railroads are collectively charging shippers supracompetitive rates.

33. The railroad industry today does not behave like a competitive market at all. Instead, it is dominated by the Defendants in this case. As one prominent railroad economist put it: "[R]ates charged shippers are surging and bottom lines are growing as if on steroids." Frank N. Wilner, *A Tale of Two (Railroad) Stories*, 72 JOURNAL OF TRANSPORTATION LAW, LOGISTICS AND POLICY 235, 238 (2005).

## THE RAILROADS INTRODUCE FUEL SURCHARGES

34. By the early 2000's, the industry had consolidated to the point where further mergers were unlikely if not impossible. In response to the proposed Burlington Northern Santa Fe (BNSF) and Canadian National Railway Co. (CN) merger, the Surface Transportation Board ("STB"), which succeeded the ICC, put a moratorium on new mergers and then promulgated more stringent standards for merger review. Railroads were experiencing surging freight demand and tight capacity. In this environment, the railroads faced a stark choice: build new rail capacity to meet growing demand, or squeeze more revenue out of shippers using existing capacity. The railroads chose the latter course and seized on the rail fuel surcharge as the means to implement their price fixing conspiracy.

10

35.     Since passage of the Staggers Act in 1980, railroads had increasingly entered into transportation contracts with cost escalation provisions often tied to the "Rail Cost Adjustment Factor" ("RCAF"). The RCAF was published by the Association of American Railroads ("AAR"), the industry trade association, and included fuel prices as a component of the cost escalation.   In fourth quarter 2002, the AAR -- which is controlled by the major Class I railroads -- published, for the first time, a RCAF without fuel (i.e., a cost escalation index without fuel as a component). This was not done by accident or mistake. It was a conscious decision made by the AAR to remove fuel costs from the RCAF index so that Defendants, which controlled the AAR, could begin assessing separate Rail Fuel Surcharges and coordinating that practice.

36.     Predictably, that is what happened. Following publication of the "RCAF index without fuel," Defendants seized the opportunity and began to apply a Rail Fuel Surcharge as a separate item on the shipper's bill. When the price of oil began to rise dramatically in late 2003 and early 2004, Defendants began to see that they could use monthly changes to the fuel surcharge as an easy way to dramatically increase their revenues without having to renegotiate individual contracts or wait for new rail capacity to come on line to meet growing demand – so long as all the Defendants participated and did not undercut each other.

## DEFENDANTS' PRICE FIXING CONSPIRACY

37.     Commencing in or about July 2003 or earlier, Defendants agreed to stop competing with one another with respect to prices they charged rail shippers and customers for carload shipments. The key element of this price fixing conspiracy was an agreement by Defendants to act in concert with one another in demanding the Rail Fuel Surcharges from rail shippers and customers. Pursuant to this conspiracy, Defendants all agreed to apply Rail Fuel Surcharges computed as a percentage of the base rail freight rate (i.e., revenue), rather than as a percentage of the actual cost of fuel consumption associated with the individual movement to which the surcharge was applied.

11

38.    Such a "revenue-based" fuel surcharge bore no direct relationship to Defendants'

actual increase in fuel costs. Defendants have acknowledged that their fuel surcharge program is not

a cost recovery mechanism, but a revenue enhancement measure intended to achieve across-the-

board increases in the prices charged by Defendants for unregulated rail freight transportation.

39.    Defendants implemented their agreement by exchanging information both in private

and by publicly announcing agreed-upon surcharge increases and posting the monthly fuel surcharge

percentages on their websites. They did so for purposes of monitoring and enforcing the agreed-

upon Rail Fuel Surcharge levels.

40.    As a result of Defendants' concerted action, prices of Rail Fuel Surcharges charged to

rail shippers and customers (members of the Class) were raised to or maintained at supra-

competitive levels throughout the Class Period.

41.    On January 25, 2007, the STB, which regulates certain aspects of the railroad

industry, issued an administrative decision concluding that the railroads' practice of computing Rail

Fuel Surcharges as a percentage of base rate for regulated rail freight transport was an "unreasonable

practice," because the fuel surcharges are not tied to the fuel consumption associated with the

individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan.

25, 2007).

42.    The STB also found that the railroads had been "double dipping" – applying to the

same traffic both a fuel surcharge and a rate increase that is based on the RCAF or other index that

includes a fuel cost component. The STB ordered Defendants to change these practices. The STB's

decision addressed rate regulated rail freight traffic only (which is not the subject of this Complaint).

The STB stated that its decision does not apply to rail freight traffic under contract or otherwise

exempted from rate regulation.

43.     Defendants applied the same unreasonable fuel surcharge practices to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

## ELEMENTS OF THE PRICE FIXING CONSPIRACY

44.     The essential element of Defendants' conspiracy was an agreement to compute Rail Fuel Surcharges not as a cost recovery mechanism for the specific transportation to which it was applied, but as a multiplier percentage of the base rate charged for the rail freight transportation involved.  Defendants applied these surcharges not only to published tariff rates, but to private contracts, and other traffic, not subject to rate regulation under federal law (i.e., the unregulated rates at issue here).

45.     Defendants began to implement their conspiracy at least as early as June 2003 when the two western railroads, BNSF and UP (the "Western Railroads"), agreed to coordinate their prices relative to Rail Fuel Surcharges.   Prior to this time, the UP carload fuel surcharge was adjusted monthly based on the West Texas Intermediate ("WTI") Crude Oil Index.  The BNSF carload fuel surcharge was based on the US Department of Energy (DOE) On-Highway Diesel Fuel Price Index ("HDF").  In or about June 2003, however, the UP switched to the HDF Index pursuant to an agreement with the BNSF.   From that point on, the Western Railroads moved in lockstep and charged the exact same Rail Fuel Surcharge percentage for each month of the class period.

46.     The Western Railroads agreed to administer the HDF index in precisely the same way.  Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied.  When the HDF Index exceeded $1.35 per gallon, however, the Western Railroads both applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon.  So, for example, if the HDF Index rose to $1.55 per gallon, the

Western Railroads would apply a surcharge of 2 percent.  The surcharge would increase 2 percent for every 20 cents increase in the HDF Index.

47.     The Western Railroads also coordinated when they would change their fuel surcharge.  They agreed that the Fuel Surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF average price calculation.  So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March.  The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

48.     The choice to use the HDF Index for fuel surcharges was arbitrary.  Also arbitrary was the decision to set the trigger point at $1.35 per gallon and to apply the surcharge in the second calendar month after the HDF average price had changed.  The fact that the Western Railroads both chose and adhered to this same combination of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior.  The similarities are both too precise and too comprehensive to have been arrived at independently.

49.     Using the HDF index, the two Western Railroads moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

50.     The chart below shows that the Fuel Surcharge Percentages charged by the Western Railroads for carload shipments varied before the class period began, but were identical starting in July 2003:

**MONTHLY SURCHARGE PERCENTAGES -- WESTERN RAILROADS**

| MONTH | BNSF | UP |
|-------|------|----|
| Jun-02 | 1 | 0 |
| Jul-02 | 1 | 0 |

| MONTH | BNSF | UP |
|-------|------|-----|
| Aug-02 | 0 | 0 |
| Sep-02 | 0 | 0 |
| Oct-02 | 1% | 0 |
| Nov-02 | 2% | 0 |
| Dec-02 | 2.5% | 0 |
| Jan-03 | 2% | 2 |
| Feb-03 | 2% | 2 |
| Mar-03 | 2.5% | 2 |
| Apr-03 | 4.5% | 2 |
| May-03 | 2% | 2 |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |

| MONTH | BNSF | UP |
|--------|-------|-------|
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |

51.     Defendants CSX and NS, located in the east, began to implement the conspiracy in February 2004 or earlier, and KCS, located in the Midwest, agreed to join the conspiracy in June 2005 or earlier.  (Defendants CSX, NS and KCS collectively are the "Eastern Railroads").  The Eastern Railroads all agreed to base their fuel surcharge programs on the average monthly price of West Texas Intermediate ("WTI") Crude Oil as published in the *Wall Street Journal*.  Indeed, not only did these railroads all agree to use the WTI index (as opposed to many other available indices); once they had joined the conspiracy, they too agreed to administer the index in precisely the same way.

52.     Specifically, after an initial period in which their selected WTI trigger price differed, the Eastern Railroads agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel.  When that happened, Defendants' rates were increased 0.4 percent for every $1 dollar that the price of WTI oil exceeded $23 per barrel.  So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent.  The Rail Fuel Surcharge would be adjusted upward at 2 percent for every $5 increase in the WTI average price.

53.     The Eastern Railroads also coordinated when they would change their fuel surcharge – two calendar months after the WTI index had adjusted, thereby adopting fuel surcharge price timing used by the Western Railroads.  For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March.  In this way, Defendants could apply exactly the same

fuel surcharge percentage month after month.  The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

54.     The choice to use the WTI index for fuel surcharges was arbitrary.  Also arbitrary was the decision to set the trigger point at $23 per barrel and to apply the surcharge in the second calendar month after the average price of WTI oil had changed.  The fact that Defendants CSX, NS, and KCS all chose and adhered to this same combination of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior.  The similarities are too precise and too comprehensive to have been arrived at independently.

55.     The net result is that there was uniformity among the Eastern Railroads in the monthly surcharge percentages they charged customers for most of the Class Period.  Although KCS used different fuel surcharge percentages for certain months of the Class Period, in June 2005 it adopted the same fuel surcharge percentage used by CSX and NS and moved in lock step with them for the remainder of the Class Period.  KCS has different operations and fuel consumption patterns from the larger US railroads, making it unlikely that the KCS would adopt the same fuel surcharge percentages as the other railroads absent a conspiracy.

56.     The chart below shows that the Fuel Surcharge Percentages charged by Defendants CSX and NS for carload shipments varied before the class period, but were identical starting in February 2004, and they also were identical to those of the KCS starting in June 2005, when the KCS joined the conspiracy:

### MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS

| MONTH | CSX | NS | KCS |
|---|---|---|---|
| Jun-03 | 2.4% | 2% | |
| Jul-03 | 2.4% | 2% | |
| Aug-03 | 3.2% | 2% | |
| Sep-03 | 3.2% | 2% | |
| Oct-03 | 3.6% | 2% | |
| Nov-03 | 2.4% | 2.0% | |

| MONTH | CSX | NS | KCS |
|---|---|---|---|
| Dec-03 | 3.2% | 2.0% | |
| Jan-04 | 3.6% | 2.0% | |
| Feb-04 | 4.0% | 2% | |
| **Mar-04** | **4.8%** | **4.8%** | |
| Apr-04 | 4.8% | 4.8% | |
| May-04 | 5.6% | 5.6% | |
| Jun-04 | 5.6% | 5.6% | |
| Jul-04 | 7.2% | 7.2% | |
| Aug-04 | 6.4% | 6.4% | |
| Sep-04 | 7.2% | 7.2% | |
| Oct-04 | 8.8% | 8.8% | |
| Nov-04 | 9.2% | 9.2% | |
| Dec-04 | 12.4% | 12.4% | 10.0% |
| Jan-05 | 10.4% | 10.4% | 10.0% |
| Feb-05 | 8.4% | 8.4% | 10.0% |
| Mar-05 | 9.6% | 9.6% | 10.0% |
| Apr-05 | 10.0% | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% | 10.0% |
| **Jun-05** | **12.4%** | **12.4%** | **12.4%** |
| Jul-05 | 10.8% | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% | 12.8% |

57.     In stark contrast to this uniformity in fuel surcharge percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the east and the west, would independently price their Rail Fuel Surcharges to arrive at the identical percentage month after

month, year after year, for a period of more than three years.  The fact that Defendants have moved in uniform lockstep for a period of nearly 38 months indicates that Defendants were coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges.  In a competitive environment, free of collusion, carriers with lower fuel costs would impose a lower surcharge to obtain a competitive advantage.

## ADDITIONAL EVIDENCE OF A CONSPIRACY

58.    Apart from this direct evidence of price fixing, "plus factors" further support the allegation that Defendants agreed to fix prices for Rail Fuel Surcharges.  The rail transportation industry is marked by certain structural and other characteristics that make a price fixing cartel feasible:

a.    The railroad industry is highly concentrated.  Defendants in this case are the five remaining domestic Class I railroads following decades of mergers and consolidation. Defendants account for well over 90 percent of the nation's rail traffic.  Such high concentration facilitates the possibility of a price fixing cartel.

b.    There are significant barriers to entry into the railroad industry.  To compete, railroads must invest in a vast network of tracks, stations, yards, and switching facilities. These take decades to develop, and require onerous regulatory and environmental reviews and approval.  Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of eminent domain power.  Because rail infrastructure is of minimal value for other purposes, and rail networks are difficult to assemble, the fixed costs are largely sunk, creating significant entry barriers.  Entry also requires that a new entrant capture a significant market share from existing carriers.  Entry is thus both expensive and risky.

c.    Rail Fuel Surcharges, when computed as a percentage of revenue, are highly standardized. Defendants structured their Rail Fuel Surcharges as a percentage of base rates and then published the percentages on their websites so the colluding railroads could police the conspiracy without frequent communications. It is well recognized that markets having uniform and homogeneous products or services are susceptible to price fixing.

d.    The railroad industry has a history of price fixing and other anti-competitive behavior. In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290 (1897), the railroad cartel argued that it must price fix or the industry would go bankrupt. Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate making committees." Although these bodies have disappeared from the rail industry in the wake of the Staggers Act, the railroad industry has continued to engage in market manipulation, unreasonable rate practices, and other discriminatory practices against a wide spectrum of freight customers.

e.    The CEO's of Defendants are all board members of the AAR, which facilitates transfer of pricing information. The AAR describes itself as "the central coordinating and research agency of the North American rail industry." Full membership, however, is available only to the seven Class I railroads operating in the United States, the five most significant of which are Defendants here (the other two Class I railroads are owned by Canadian companies).[1] The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

---

[1]    A Class I railroad is one having revenues in excess of $250 million in 1991 dollars ($319.3 million in 2005 dollars). There are currently seven Class I railroads operating in the United States: (1) BNSF; (2) CSX; (3) Grand Trunk Corporation; (4) KCS; (5) NS; (6) Soo Line Railroad Co.; and (7) UP.    The Soo Line Railroad is owned by Canadian Pacific Railway.    The Grand Trunk Corporation is owned by the Canadian National Railway.

59.     Apart from these structural market features, Defendants did not behave as if they were in a competitive market.  Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants that the Rail Fuel Surcharges were "not negotiable."

60.     Several national shipper organizations in fact met with each of the Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges.  Among the Defendants, only the BNSF agreed to make responsive changes to its surcharge program, and that was only for grain and coal shipments coming from certain regions where the BNSF is the only carrier.  The other Defendants refused to address the concerns of their customers.

61.     At or about the time Defendants agreed to fix the Rail Fuel Surcharge prices, they largely switched from offering long-term contracts to offering contracts that were "re-priced" in new negotiations semi-annually, quarterly or monthly.  Previously, Defendants had allowed, and often preferred, long term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point or that excluded fuel surcharges altogether.

62.     Defendants made this switch even though most shippers preferred the former system in order to minimize risk.  In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business.  Here, all Defendants raised prices and did not offer any compensation to customers for assuming additional risk.  This behavior gives rise to an inference of price fixing.

63.     Defendants sometimes stopped offering "through rates," in which a shipper would receive a single bill from either the originating shipper or the termination railroad and a single fee would be allocated among the railroads that shipped.  Instead, Defendants moved to what is known

in the industry as "Rule 11 pricing." Under Rule 11 pricing, where a shipment requires movement on more than one carrier, the two rates are stated separately rather than as one quote for the entire shipment. Defendants made this change as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each railroad to apply the agreed-upon Rail Fuel Surcharge in its own territory.

64.     Finally, demand for rail freight transportation services grew substantially during the period of the conspiracy, and yet Defendants' market shares remained relatively stable and constant. The fact that market shares did not did not fluctuate significantly during the Class Period is further indication that Defendants agreed to price fix rather than to compete for new sales.

## DEFENDANTS PROFITED FROM THE SURCHARGES

65.     Because fuel surcharges are generally designed to compensate for increases in fuel costs, they should bear a relatively constant relationship to the actual cost of fuel associated with the individual movements to which they are applied. But since the beginning of the Class Period and before, Defendants have used the Rail Fuel Surcharge not as a cost recovery mechanism, but as a revenue enhancement measure. By computing the Rail Fuel Surcharge as a percentage of the base rate charged the shipper, Defendants ensured that there would be no real correlation between the rate increase and the increase in fuel costs for the particular shipment to which the surcharge is applied.

66.     Thus, the ratio of Defendants' profits to their actual fuel costs was high as a result of the concerted implementation and maintenance of the agreed-upon Rail Fuel Surcharge. Through these Rail Fuel Surcharges, Defendants realized billions of dollars in revenues during the Class Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the surcharge.

## ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

67.     The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

      a.     The Rail Fuel Surcharges charged to plaintiff and the Class for unregulated rail freight transportation have been fixed or stabilized at supra-competitive levels;

      b.     Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for unregulated rail freight transportation; and

      c.     competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

68.     By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, plaintiff and the members of the Class have sustained injury to their business or property.  The injury sustained by the plaintiff and the Class is the payment of supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged.  This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

### COUNT I

### (Violation Of § 1 Of The Sherman Act And § 4 Of The Clayton Act)

69.     Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

70.    Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

71.    The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation.  Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

72.    Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants.

73.    The contract, combination or conspiracy has had the following effects:

    a.    Prices charged to plaintiff and the Class for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supra-competitive levels;

    b.    Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight transportation services; and

    c.    competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed and eliminated.

74.    As a proximate result of Defendants' unlawful conduct, plaintiff and the Class have suffered injury in that they have paid supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation services during the Class Period.

WHEREFORE, Plaintiff prays for relief as follows:

(1)    That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that plaintiff be denominated as class representative, and that plaintiff's counsel be appointed as counsel for the Class;

(2)    That the unlawful contract, combination and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(3)    That plaintiff and the Class recover compensatory damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of plaintiff and each and every member of the Class;

(4)    That each of the Defendants' respective officers, directors, agents and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

(5)    That plaintiff and the Class recover treble damages, as provided by law;

(6)    That plaintiff and the Class recover their costs of the suit, including attorney's fees, as provided by law; and

(7)    For such further relief as the Court may deem just and proper.

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN
Attorneys for Plaintiff

By:____/s/ James E. Cecchi_____
        JAMES E. CECCHI

Dated:  May 14, 2007

Stephen Neuwirth
Quinn Emanuel Urquhart Oliver
    & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7100

Daniel Brockett
David Azar
Quinn Emanuel Urquhart Oliver
    & Hedges, LLP
865 S. Figueroa Street
Los Angeles, California 90017
(213) 443- 3000

Paul Donovan
LaRoe, Winn, Moerman & Donovan
4135 Parkglen Court, N.W.
Washington, D.C. 20007
(202) 298-8100

Richard Scruggs
Sidney Backstrom
Scruggs Law Firm, P.A.
120A Courthouse Square
P.O. Box 1136
Oxford, MS 38655
(662) 281 1212

Attorneys for Plaintiffs

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, plaintiff demands a jury

trial as to all issues triable by a jury.

CARELLA, BYRNE, BAIN, GILFILLAN,<br>
CECCHI, STEWART & OLSTEIN<br>
Attorneys for Plaintiff

By:____/s/ James E. Cecchi_____
      JAMES E. CECCHI

Dated: May 14, 2007

## CERTIFICATION

Counsel for Plaintiff hereby certifies that, to the best of their knowledge, there are no other

civil actions or arbitration proceedings pending regarding the subject matter hereof and that none are

contemplated, and that all parties who should be joined have been joined.

CARELLA, BYRNE, BAIN, GILFILLAN,<br>
CECCHI, STEWART & OLSTEIN<br>
Attorneys for Plaintiff

By:____/s/ James E. Cecchi_____
      JAMES E. CECCHI

Dated: May 14, 2007

Exhibit B

Lisa J. Rodriguez
**TRUJILLO, RODRIGUEZ & RICHARDS L.L.C**
8 Kings Highway West
Haddonfield, New Jersey 08033
Telephone: (856) 795-9002
Fax: (856) 795-9887
E mail: lisa@trrlaw.com

*Attorneys for Plaintiff Isaac Industries, Inc.*
*Additional Counsel on Signature Page*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ISSAC INDUSTRIES, INC.**, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> **CSX TRANSPORATION, INC.; BNSF RAILWAY COMPANY; UNION PACIFIC RAILROAD COMPANY; NORFOLK SOUTHERN RAILWAY COMPANY; and KANSAS CITY SOUTHERN RAILWAY COMPANY,** <br><br> Defendants. | Civil Action No. _____ <br><br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Isaac Industries, Inc. ("Isaac" or "Plaintiff"), a Florida corporation located in Miami, Florida, individually and on behalf of all others similarly situated, brings this class action for damages under the antitrust laws of the United States against Defendants CSX Transportation, Inc. ("CSX"), BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), Norfolk Southern Railway Company ("NS"), and Kansas City Southern Railway Company ("KCS") and alleges as follows:

## NATURE OF THE ACTION

1.      This is an antitrust class action charging five United States-based Class I[1]

railroads with price fixing in violation of Section 1 of the Sherman Act.  Plaintiff brings this

action on behalf of itself and a proposed class of direct purchasers who during the Class Period

(i) purchased unregulated rail freight transportation services from Defendants and their co-

conspirators and (ii) were assessed a rail surcharge for the agreed-upon transportation.[2]

Defendants collectively control over 90 percent of the rail freight traffic in the United States.

2.      Plaintiff alleges that during the Class Period, Defendants conspired to fix, raise,

maintain or stabilize prices of rail freight transportation services sold in the United States

through use of rail fuel surcharges added to customers' bills.  Throughout the Class Period,

Defendants maintained uniform prices in rail fuel surcharges by computing the surcharges as a

percentage of the rail freight transport base rate and by agreeing upon common indices and

trigger points for adjusting the percentages monthly.  Defendants also published their rail fuel

surcharges on their websites to facilitate coordination and the detection of any deviation from

collusive pricing.

3.      As a direct and proximate result of this price fixing conspiracy, Defendants have

restrained competition in the market for unregulated rail freight transportation services and

injured Plaintiff and each Class member in their business and property.  Plaintiff and the

---

[1] A Class I railroad is a railroad company having revenues in excess of $250 million in 1991
dollars ($319.3 million in 2005 dollars).  There are currently seven Class I railroads operating in
the United States: (1) BNSF; (2) CSX; (3) Grand Trunk Corporation; (4) KCS; (5) NS; (6) *Soo*
Line Railroad Co.; and (7) UP.  The Soo Line Railroad is owned by Canadian Pacific Railway.
The Grand Trunk Corporation is owned by the Canadian National Railway.
[2] "Class Period" refers to the period from July 1, 2003 to the present which includes the period
from the date of the filing of this complaint to the date of class notice.

members of the Class have paid higher prices for unregulated rail freight transportation than they would have paid absent the concerted unlawful activity alleged herein.

4.     Plaintiff seeks damages on behalf of itself and the Class for rail fuel surcharges imposed on rail freight shipments made under private transportation contracts and through other means exempt from rate regulation under federal law.  Plaintiff does not seek, on behalf of itself or the Class, damages or relief from fuel surcharges imposed on rate-regulated freight transportation.

**DEFINITIONS**

5.     As used herein, the term:

a.     "Unregulated rail freight transportation services" means rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law;

b.     "Rail Fuel Surcharge" is a separately-identified fee that is charged by the railroads for the agreed-upon transportation, purportedly to compensate for increases in the cost of fuel;

c.     "Person" means any individual, partnership, corporation, association or other business or legal entity; and

d.     "Class Period" refers to the period from July 1, 2003 to the present which includes the period from the date of the filing of this complaint to the date of class notice.

**PLAINTIFF**

6.     Plaintiff Isaac Industries, Inc. is a Florida corporation with its principal place of business located at 7330 N.W. 36th Avenue, Miami, Florida 33147.  During the Class Period, Isaac purchased rail freight transportation services at unregulated rates directly from one or more

3

of the Defendants and was assessed and paid Rail Fuel Surcharges in connection with the unregulated rail freight transportation.

7.      The prices Isaac paid to Defendants for unregulated rail freight transportation services on which Rail Fuel Surcharges were imposed were greater than the prices Isaac would have paid absent the conspiracy alleged herein.  Isaac has therefore been injured in its business and property by reason of the Defendants' antitrust violations.  Isaac asserts its claims on behalf of itself and all direct purchasers who, during the Class Period, purchased from one or more of the defendants unregulated rail freight transportation services which resulted in an imposition of Rail Fuel Charges.

<strong>DEFENDANTS</strong>

8.      Defendant CSX Transportation, Inc. has its principal place of business at 500 Water St., Jacksonville, Florida 32202.  In New Jersey, CSX maintains business offices at 1 Pennsylvania Ave, Kearny, New Jersey 07032.  CSX also operates and/or serves rail terminals in the cities of Port Newark, Newark, Jersey City, Elizabeth, North Bergen, Kearny and Ridgefield, through which it originates and terminates rail traffic within this District.  CSX is a major freight railroad operating primarily in the eastern United States and Canada.  CSX links its commercial markets in 23 states, the District of Columbia, and certain Canadian provinces.  CSX has railway lines throughout the eastern United States.

9.      Defendant Norfolk Southern Railway Company has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510.  In New Jersey, NS maintains business offices at 125 Country Road, Jersey City 07307.  NS operates and/or serves rail terminals in the cities of Port Newark, Newark, Jersey City and Elizabeth through which NS originates and terminates rail traffic within the District.  NS is a major freight railroad operating primarily in the

4

eastern United States. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world.

10.    Defendants CSX and NS jointly own Conrail, which acts as a switching carrier for CSX and NS and operates almost 200 miles of rail lines in the northern half of New Jersey. The hub of Conrail activities in the region are located in Oak Island Yard in Newark, with smaller local serving yards in Bayonne, Greenville (Jersey City), Linden, Manville, Metuchen, Old Bridge, Port Reading (Woodbridge), Red Bank, and Newark.

11.    Together CSX and NS move all rail traffic into and out of the New Jersey/New York area. The vast majority of that traffic originates or terminates within northern New Jersey, and in the environs of Newark. For example, each year CSX and NS handle, to and from the Newark area, tens of thousands of carloads of various commodities, such as chemicals and merchandise freight. Additionally, in 2006, with respect to container (or "intermodal") traffic, CSX and NS handled 339,000 containers at ExpressRail, the on-dock rail facilities in Newark. CSX and NS also handled an additional 100,000 plus containers moving in domestic service through other rail terminals in the Newark area.

12.    Defendant BNSF Railway Company has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. In New Jersey, BNSF's wholly-owned subsidiary, BNSF Logistics, LLC, maintains business offices at 375 N. Main Street, Suite C-1, Williamstown, New Jersey 08094. BNSF also originates and terminates rail traffic within the District by providing transportation in interchange service with CSX and NS. BNSF is a wholly owned subsidiary of the Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation. BNSF is the second largest railroad network in North America and operates 32,000 route miles of

railroad.  BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states.

13.     Defendant Union Pacific Company has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179.  In New Jersey, UP maintains at least one employee or agent, though the business address is currently unknown.  UP also originates and terminates rail traffic within this District by providing transportation in interchange service with CSX and NS. UP is the largest freight railroad in the United States.  UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including New Jersey).

14.     Defendant Kansas City Southern Railway Company has its principal place of business at 427 W. 12th St., Kansas City, Missouri 64105.  In New Jersey, KCS maintains business offices at 1 Executive, Somerset, New Jersey 08873.  It also originates and terminates traffic within this District by providing rail transportation in interchange service with CSX and NS.  KCS operates a major freight railroad in the central and southeastern states.

## JURISDICTION AND VENUE

15.     This action is brought under Section 4 of the Clayton Act, 15 U.S.C. §15, to recover damages, as allowed by law, costs of suit and a reasonable attorneys' fee, for defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

16.     The Court has jurisdiction over the subject matter of this action pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. §1337(a), and 28 U.S.C. §§ 1331 and 1337.

17.     Venue is proper in the District of New Jersey pursuant to 15 U.S.C. § 15(a) and 22, and 28 U.S.C. §1391.  Defendants maintain offices, have agents, transact business, and are found within this judicial District; a substantial part of the events giving rise to the claim for

relief occurred in this District; and Defendants regularly and continuously conduct business in interstate commerce that is carried out in part in this District.

18.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business in this District; (b) directly or indirectly sold and delivered unregulated rail freight transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of itself and others similarly situated.  The "Class" is defined as:

> All purchasers of rail freight transportation services from Defendants, through use of private railroad-shipper contracts or through other means exempt from rate regulation under federal law, as to which Defendants assessed a Rail Fuel Surcharge, at any time from at least as early as July 2003 to the present (the "Class Period").   Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, and any of the Defendants' co-conspirators, whether or not named as a Defendant in this Complaint.

20.     The Class is so numerous that joinder of all members is impracticable.  Given the magnitude of the commerce involved, the members of the Class are geographically dispersed, and joinder of all class members would be impracticable.  While the exact number of Class members is unknown to plaintiff at this time, plaintiff believes that there are, at minimum, thousands of members of the Class and that their identities can be readily ascertained from Defendants' books and records.

21.     Plaintiff's claims are typical of the claims of other members of the Class. Plaintiff and all members of the Class directly purchased unregulated rail freight transportation from Defendants, with respect to which Defendants imposed the artificially inflated Rail Fuel Surcharges established and maintained by the actions of the Defendants in connection with the restraint of trade alleged herein.  Plaintiff and the members of the Class have all sustained damage in that they paid inflated prices for the unregulated rail freight transportation services at issue as a result of Defendants' conduct in violation of federal law.  Plaintiff is a direct purchaser of unregulated rail freight transportation from Defendants, and its interest is coincident with, and not antagonistic to, those of the other members of the Class.

22.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and antitrust litigation.

23.     Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

a.      Whether Defendants conspired, contracted or combined with others, for the purpose of, and with the effect of, raising, fixing, maintaining, pegging, or stabilizing the price of Rail Fuel Surcharges applied to unregulated rail freight transportation services purchased by the Class;

b.      Whether Defendants undertook actions to conceal the unlawful conspiracies, contracts or combinations described herein;

c.      The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

8

d.      Whether Defendants' conduct violated the federal antitrust laws; and

e.      Whether Defendants' conduct caused injury to the business and property of

plaintiff and the Class and, if so, the proper measure of damages.

24.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy, since joinder of all Class members is impracticable.  The

prosecution of separate actions by individual members of the Class would impose heavy burdens

upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications

of the questions of law and fact common to the Class.  A class action, on the other hand, would

achieve substantial economies of time, effort and expense and would assure uniformity of

decision as to persons similarly situated without sacrificing procedural fairness or brining about

other undesirable results.

25.     The interests of members of the Class in individually controlling the prosecution

of separate actions are theoretical rather than practical. The Class has a strong and pervasive

community of interest, and prosecution of the action through representatives would be

unobjectionable.  The amounts at stake for Class members, while substantial in the aggregate, are

not great enough individually to enable them to maintain separate suits against Defendants.  No

difficulty is anticipated in the management of this action as a class action.

## INTERSTATE TRADE AND COMMERCE

26.     During the Class Period, Defendants accounted for over 90 percent of all rail

shipments within the United States.  The U.S. market for rail transportation services is estimated

at more than $51 billion in 2006.

27.     The activities of Defendants and their co-conspirators were within the flow of,

and substantially affected, interstate and international commerce.  During the Class Period,

9

Defendants and their co-conspirators sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate or foreign commerce (or both) to sell and market rail freight transportation services.

28.     The unlawful activities of Defendants and the unnamed co-conspirators have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

## DEREGULATION OF THE RAILROAD INDUSTRY

29.     Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980. This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

30.     Prior to the Staggers Act, the Interstate Commerce Commission ("ICC") prohibited railroads from charging rates different from those contained in published tariffs filed by the railroads with the ICC. Today, however, 80 percent or more of all rail shipments are exempt from rate regulation or move under private transportation contracts, which are likewise free of rate regulation.

31.     Since 1980, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities). Five of these railroads -- the Defendants in this case -- operate more than 90 percent of all railroad track in the U.S. and account for more than $51 billion in total revenue.

32.     Rail freight shippers across the nation are being subjected to an endless string of rate increases by railroads made possible by a concentrated market structure, tight capacity, and coordinated pricing. Although the reason for deregulation of the railroad industry was to promote

competition and lower freight rates, it is now clear that the opposite has come true - railroads are collectively charging shippers supra-competitive rates.

33.     The railroad industry today does not behave like a competitive market. Instead, it is dominated by the Defendants in this case. As one prominent railroad economist put it: "[R]ates charged shippers are surging and bottom lines are growing as if on steroids."  Frank N. Wilner, A *Tale of Two (Railroad) Stories*, 72 JOURNAL OF TRANSPORTATION LAW, LOGISTICS AND POLICY 235, 238 (2005).

## THE RAILROADS INTRODUCE FUEL SURCHARGES

34.     By the early 2000's, the industry had consolidated to the point where further mergers were unlikely if not impossible. In response to the proposed Burlington Northern Santa Fe (BNSF) and Canadian National Railway Co. (CN) merger, the Surface Transportation Board ("STB"), which succeeded the ICC, put a moratorium on new mergers and then promulgated more stringent standards for merger review.  Railroads were experiencing surging freight demand and tight capacity.  In this environment, the railroads faced a stark choice:  build new rail capacity to meet growing demand, or squeeze more revenue out of shippers using existing capacity.  The railroads chose the latter course and seized on the rail fuel surcharge as the means to implement their price fixing conspiracy.

35.     Since passage of the Staggers Act in 1980, railroads had increasingly entered into transportation contracts with cost escalation provisions often tied to the "Rail Cost Adjustment Factor" ("RCAF").  The RCAF was published by the Association of American Railroads ("AAR"), the industry trade association, and included fuel prices as a component of the cost escalation.  In fourth quarter 2002, the AAR – which is controlled by the major Class I railroads – published, for the first time, a RCAF without fuel (*i.e.*, a cost escalation index without fuel as a

11

component).  This was not done by accident or mistake.  It was a conscious decision made by the AAR to remove fuel costs from the RCAF index so that Defendants, which controlled the AAR, could begin assessing separate Rail Fuel Surcharges and coordinating that practice.

36.     Predictably, that is what happened.  Following publication of the "RCAF index without fuel," Defendants seized the opportunity and began to apply a Rail Fuel Surcharge as a separate item on the shipper's bill.  When the price of oil began to rise dramatically in late 2003 and early 2004, Defendants began to see that they could use monthly changes to the fuel surcharge as an easy way to dramatically increase their revenues without having to renegotiate individual contracts or wait for new rail capacity to come on line to meet growing demand – so long as all the Defendants participated and did not undercut each other.

## DEFENDANTS' PRICE FIXING CONSPIRACY

37.     Commencing on or about July 2003 or earlier, Defendants agreed to stop competing with one another with respect to prices they charged rail shippers and customers for carload shipments.  The key element of this price fixing conspiracy was an agreement by Defendants to act in concert with one another in demanding the Rail Fuel Surcharges from rail shippers and customers.  Pursuant to this conspiracy, Defendants all agreed to apply Rail Fuel Surcharges computed as a percentage of the base rail freight rate (*i.e.*, revenue), rather than as a percentage of the actual cost of fuel consumption associated with the individual movement to which the surcharge was applied.

38.     Such a "revenue-based" fuel surcharge bore no direct relationship to Defendants' actual increase in fuel costs.  Defendants have acknowledged that their fuel surcharge program is not a cost-recovery mechanism, but a revenue-enhancement measure intended to achieve across-

the-board increases in the prices charged by Defendants for unregulated rail freight transportation.

39.     Defendants implemented their agreement by exchanging information both in private and by publicly announcing agreed-upon surcharge increases and posting the monthly fuel surcharge percentages on their websites.  They did so for purposes of monitoring and enforcing the agreed-upon Rail Fuel Surcharge levels.

40.     As a result of Defendants' concerted action, prices of Rail Fuel Surcharges charged to rail shippers and customers (members of the Class) were raised to or maintained at supra-competitive levels throughout the Class Period.

41.     On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007).

42.     The STB also found that the railroads had been "double dipping" – applying to the same traffic both a fuel surcharge and a rate increase that is based on the RCAF or other index that includes a fuel cost component.  The STB ordered Defendants to change these practices. The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint).  The STB stated that its decision does not apply to rail freight traffic under contract or otherwise exempted from rate regulation.

13

43.   Defendants applied the same unreasonable fuel surcharge practices to the private rail freight transportation contracts and other unregulated freight transportation services at issue in this case.

## ELEMENTS OF THE PRICE FIXING CONSPIRACY

44.   The essential element of Defendants' conspiracy was an agreement to compute Rail Fuel Surcharges not as a cost-recovery mechanism for the specific transportation to which it was applied, but as a multiplier-percentage of the base rate charged for the rail freight transportation involved.  Defendants applied these surcharges not only to published tariff rates, but to private contracts and other traffic not subject to rate regulation under federal law (*i.e.*, the unregulated rates at issue here).

45.   Defendants began to implement their conspiracy at least as early as July 2003 when the two Western railroads, BNSF and UP (the "Western Railroads"), agreed to coordinate their prices relative to Rail Fuel Surcharges.  Prior to this time, the UP carload fuel surcharge was adjusted monthly based on the West Texas Intermediate Crude Oil Index ("WTI Index").  The BNSF carload fuel surcharge was based on the U.S. Department of Energy (DOE) On-Highway Diesel Fuel Price Index ("HDF Index").  In or about July 2003, however, UP switched to the HDF Index pursuant to an agreement with BNSF.  From that point on, the Western Railroads moved in lockstep and charged the exact same Rail Fuel Surcharge percentage for each month of the Class Period.

46.   The Western Railroads agreed to administer the HDF Index in precisely the same way.  Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied.  When the HDF Index exceeded $1.35 per gallon, however, the Western Railroads both applied a surcharge of 0.5 percent for

14

every five-cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, the Western Railroads would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20 cents increase in the HDF Index.

47.     The Western Railroads also coordinated *when* they would change their fuel surcharge. They agreed that the Rail Fuel Surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF average price calculation. So, for example, if the HDF Index average price changed in January, the Western Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

48.     The choice to use the HDF Index for fuel surcharges was arbitrary. The decision to set the trigger point at $1.35 per gallon and to apply the surcharge in the second calendar month after the HDF average price had changed was also arbitrary. The fact that the Western Railroads both chose and adhered to this same combination of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior. The similarities are both too precise and too comprehensive to have been arrived at independently.

49.     Using the HDF Index, the two Western Railroads moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

50.     The HDF Index shows that the Fuel Surcharge Percentages charged by the Western Railroads for carload shipments varied before the Class Period began, but were identical starting in July 2003.

51.     Defendants CSX and NS, located in the East, began to implement the conspiracy in February 2004 or earlier, and KCS, located in the Midwest, agreed to join the conspiracy in June 2005 or earlier (Defendants CSX, NS and KCS collectively are the "Eastern Railroads"). The Eastern Railroads all agreed to base their fuel surcharge programs on the average monthly price of West Texas Intermediate Crude Oil ("WTI Index") as published in the *Wall Street Journal*. Indeed, not only did these railroads all agree to use the WTI Index (as opposed to many other available indices); once they had joined the conspiracy, they too agreed to administer the index in precisely the same way.

52.     Specifically, after an initial period in which their selected WTI-trigger price differed, the Eastern Railroads agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel. When that happened, Defendants' rates were increased 0.4 percent for every dollar that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The Rail Fuel Surcharge would be adjusted upward at 2 percent for every $5 increase in the WTI average price.

53.     The Eastern Railroads also coordinated *when* they would change their fuel surcharge – two calendar months after the WTI Index had adjusted, thereby adopting fuel surcharge price-timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, Defendants could apply exactly the same fuel surcharge percentage month after month. The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

54.     The choice to use the WTI Index for fuel surcharges was arbitrary. The decision to set the trigger point at $23 per barrel and to apply the surcharge in the second calendar month after the average price of WTI oil had changed was also arbitrary. The fact that Defendants CSX, NS, and KCS all chose and adhered to this same combination of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior. The similarities are too precise and too comprehensive to have been arrived at independently.

55.     The net result is that there was uniformity among the Eastern Railroads in the monthly surcharge percentages they charged customers for most of the Class Period. Although KCS used different fuel surcharge percentages for certain months of the Class Period, in June 2005 it adopted the same fuel surcharge percentage used by CSX and NS and moved in lockstep with them for the remainder of the Class Period. KCS has different operations and fuel consumption patterns from the larger U.S. railroads, making it unlikely that the KCS would adopt the same fuel surcharge percentages as the other railroads absent a conspiracy.

56.     The Rail Fuel Surcharge percentages charged by Defendants CSX and NS for carload shipments varied before the Class Period, but were identical starting in February 2004, and they also were identical to those of the KCS starting in June 2005, when the KCS joined the conspiracy:

57.     In stark contrast to this uniformity in Rail Fuel Surcharge percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the East and the West, would independently price their Rail Fuel Surcharges to arrive at the identical percentage month after month, year after year, for a period of more than three years. The fact that Defendants have moved in uniform lockstep for a period of nearly 38 months indicates that Defendants were

coordinating their behavior and conspired to fix prices for Rail Fuel Surcharges.  In a competitive environment, free of collusion, carriers with lower fuel costs would impose a lower surcharge to obtain a competitive advantage.

## ADDITIONAL EVIDENCE OF CONSPIRACY

58.     Apart from this direct evidence of price fixing, "plus factors" further support the allegation that Defendants agreed to fix prices for Rail Fuel Surcharges.  The rail transportation industry is marked by certain structural and other characteristics that make a price fixing cartel feasible:

a.     The railroad industry is highly concentrated.  Defendants in this case are the five remaining domestic Class I railroads following decades of mergers and consolidation.  Defendants account for well over 90 percent of the nation's rail traffic.  Such high concentration facilitates the possibility of a price fixing cartel.

b.     There are significant barriers to entry into the railroad industry.  To compete, railroads must invest in a vast network of tracks, stations, yards, and switching facilities.  These take decades to develop, and require onerous regulatory and environmental reviews and approval.  Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of eminent domain power.  Because rail infrastructure is of minimal value for other purposes, and rail networks are difficult to assemble, the fixed costs are largely sunk, creating significant entry barriers.  Entry also requires that a new entrant capture a significant market share from existing carriers.  Entry is thus both expensive and risky.

c.     Rail Fuel Surcharges, when computed as a percentage of revenue, are highly standardized.  Defendants structured their Rail Fuel Surcharge programs as a percentage

of base-rates and then published the percentages on their websites, so the colluding railroads could police the conspiracy without frequent communications. It is well-recognized that markets having uniform and homogeneous products or services are susceptible to price fixing.

        d.     The railroad industry has a history of price fixing and other anti-competitive behavior. In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass'n, 166* U.S. 290 (1897), the railroad cartel argued that it must price fix or the industry would go bankrupt. Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate making committees." Although these bodies have disappeared from the rail industry in the wake of the Staggers Act, the railroad industry has continued to engage in market manipulation, unreasonable rate practices, and other discriminatory practices against a wide spectrum of freight customers.

        e.     The CEOs of Defendants are all board members of the AAR, which facilitates transfer of pricing information. The AAR describes itself as "the central coordinating and research agency of the North American rail industry. " Full membership, however, is available only to the seven Class I railroads operating in the United States, the five most significant of which are Defendants here (the other two Class I railroads are owned by Canadian companies). The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

    59.    Apart from these structural market features, Defendants did not behave as if they were in a competitive market. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants that the Rail Fuel Surcharges were "not negotiable."

60.     Several national shipper organizations in fact met with each of the Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges.  Among the Defendants, only the BNSF agreed to make responsive changes to its surcharge program, and that was only for grain and coal shipments coming from certain regions where the BNSF is the only carrier.  The other Defendants refused to address the concerns of their customers.

61.     At or about the time Defendants agreed to fix the Rail Fuel Surcharge prices, they largely switched from offering long-term contracts to offering contracts that were "re-priced" in new negotiations semi-annually, quarterly or monthly.  Previously, Defendants had allowed, and often preferred, long term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point or that excluded fuel surcharges altogether.

62.     Defendants made this switch even though most shippers preferred the former system in order to minimize risk.  In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business.  Here, all Defendants raised prices and did not offer any compensation to customers for assuming additional risk.  This behavior gives rise to an inference of price fixing.

63.     Defendants sometimes stopped offering "through rates," in which a shipper would receive a single bill from either the originating shipper or the termination railroad and a single fee would be allocated among the railroads that shipped.  Instead, Defendants moved to what is known in the industry as "Rule 11 pricing."  Under Rule 11 pricing, where a shipment requires movement on more than one carrier, the two rates are stated separately rather than as one quote for the entire shipment.  Defendants made this change as part of their conspiracy for two reasons:

to provide transparency as to what each railroad was charging on multiple line shipments and to allow each railroad to apply the agreed-upon Rail Fuel Surcharge in its own territory.

64.     Finally, demand for rail freight transportation services grew substantially during the period of the conspiracy, and yet Defendants' market shares remained relatively stable and constant.  The fact that market shares did not fluctuate significantly during the Class Period is further indication that Defendants agreed to price fix rather than to compete for new sales.

## DEFENDANTS PROFITED FROM THE SURCHARGES

65.     Because fuel surcharges are generally designed to compensate for increases in fuel costs, they should bear a relatively constant relationship to the actual cost of fuel associated with the individual movements to which they are applied.  But since the beginning of the Class Period and before, Defendants have used the Rail Fuel Surcharge not as a cost recovery mechanism, but as a revenue enhancement measure.  By computing the Rail Fuel Surcharge as a percentage of the base rate charged the shipper, Defendants ensured that there would be no real correlation between the rate increase and the increase in fuel costs for the particular shipment to which the surcharge is applied.

66.     Thus, the ratio of Defendants' profits to their actual fuel costs was high as a result of the concerted implementation and maintenance of the agreed-upon Rail Fuel Surcharge. Through these Rail Fuel Surcharges, Defendants realized billions of dollars in revenues during the Class Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the surcharge.

## ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

67.     The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

21

a.     The Rail Fuel Surcharges charged to Plaintiff and the Class for unregulated rail freight transportation have been fixed or stabilized at supra-competitive levels;

b.     Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for unregulated rail freight transportation; and

c.     Competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

68.     By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff and the members of the Class have sustained injury to their business or property. The injury sustained by Plaintiff and the Class is the payment of supra-competitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

## COUNT ONE

### (Violation of § 1 of the Sherman Action and § 4 of the Clayton Act)

69.     Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

70.     Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

71.     The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract,

22

combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

72.     Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants.

73.     The contract, combination or conspiracy has had the following effects:

a.     Prices charged to Plaintiff and the Class for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supra-competitive levels;

b.     Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for unregulated rail freight transportation services; and

c.     Competition in establishing the prices paid, customers of, and territories for unregulated rail freight transportation services has been unlawfully restrained, suppressed and eliminated.

74.     As a proximate result of Defendants' unlawful conduct, Plaintiff and the Class have suffered injury in that they have paid supra-competitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation services during the Class Period.

WHEREFORE, Plaintiff prays for relief as follows:

(1)     That the Court determine that this action may be maintained as a class action under Rules 23 of the Federal Rules of Civil  Procedure, that Plaintiff be denominated as class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

(2)     That the unlawful contract, combination and conspiracy alleged in Count One be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(3)    That Plaintiff and the Class recover compensatory damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of Plaintiff and each and every member of the Class;

(4)    That each of the Defendants' respective officers, directors, agents and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

(5)    That Plaintiff and the Class recover treble damages, as provided by law;

(6)    That Plaintiff and the Class recover their costs of the suit, including attorney's fees, as provided by law; and

(7)    For such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(e) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

## CERTIFICATION

Counsel for Plaintiff hereby certifies, pursuant to Local Civil Rules 11.2 and 40.1(c)(2), that, to the best of their knowledge, this case and matter in controversy is related to another action filed in the District of New Jersey on May 14, 2007, styled *Dust Pro, Inc. v. CSX Transportation, Inc., BNSF Railway Company, Union Pacific Railroad Company, Norfolk Southern Railway Company, and Kansas City Southern Railway Company.*

Dated: May 15, 2007       Respectfully submitted,

**TRUJILLO RODRIGUEZ & RICHARDS L.L.C**

By:  s/ Lisa J. Rodriguez
Lisa J. Rodriguez
8 Kings Highway West
Haddonfield, New Jersey 08033
Telephone: (856) 795-9002
Fax: (856) 795-9887
E mail:  lisa@trrlaw.com

Robert N. Kaplan
Linda P. Nussbaum
**KAPLAN FOX & KILSHEIMER L.L.P.**
805 Third Avenue, 22nd Floor
New York, New York 10022
Telephone:  (212) 687-1980
Fax:  (212) 687-7714
E mail:  rkaplan@kaplanfox.com
E mail:  lnussbaum@kaplanfox.com

Michael E. Criden
Kevin B. Love
**HANZMAN, CRIDEN & LOVE, P.A.**
7301 S.W. 57th Court, Suite 515
South Miami, Florida 33143
Telephone:  (305) 357-9000
Facsimile:  (305) 357-9050
E mail:  mcriden@hanzmancriden.com
E mail:  klove@hanzmancriden.com

*Attorneys for Plaintiff Isaac Industries, Inc.*

Exhibit C

*JH*

**FILED**

MAY 2 5 2007  *rq*
MAY 25 2007
**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| DAD'S PRODUCTS COMPANY, INC., on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BNSF RAILWAY COMPANY, CSX TRANSPORTATION, INC., KANSAS CITY SOUTHERN RAILWAY COMPANY, NORFOLK SOUTHERN RAILWAY COMPANY, and UNION PACIFIC RAILROAD COMPANY,<br><br>Defendants. | **07CV2954**<br>**JUDGE DER-YEGHIAYAN**<br>**MAG.JUDGE DENLOW**<br><br>**CLASS ACTION COMPLAINT and DEMAND FOR JURY TRIAL** |

Plaintiff Dad's Products Company, Inc. ("Dad's Products" or "Plaintiff"), by and through undersigned counsel, complains and alleges upon information and belief except as to those paragraphs applicable to Plaintiff individually, which are based on personal knowledge. Plaintiff brings this action individually and on behalf of a class of all those similarly situated, as defined below, seeking treble damages under the antitrust laws of the United States against Defendants, and alleges as follows:

**NATURE OF THE ACTION**

1.      This antitrust class action charges that five United States-based railroads have engaged in price fixing in violation of Section 1 of the Sherman Antitrust Act of 1890 ("Sherman Act"), 15 U.S.C. § 1. Plaintiff brings this action to recover treble damages under Section 1 of the Sherman Act, pursuant to Section 4 of the Clayton Act of 1914 ("Clayton Act"), 15 U.S.C. § 15.

2.      Plaintiff brings this action on behalf of itself and a class of entities who purchased unregulated rail freight transportation services directly from Defendants and their co-conspirators

from July 1, 2003 to the present (the "Class Period") and who were assessed a rail fuel surcharge for the agreed-upon transportation (the "Class"). As used herein, the term "unregulated" refers to rail freight transportation services for which rates are set by private contracts or through other means exempt from rate regulation under federal law.

3.     During the Class Period, Defendants conspired to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States through use of so-called "rail fuel surcharges" added to customers' bills. A rail fuel surcharge (hereafter, "Rail Fuel Surcharge") is a separately-identified fee added to the base rate charged by railroads for agreed-upon transportation.

4.     Defendants maintained uniformity of Rail Fuel Surcharges throughout the Class Period by agreeing to compute the surcharges as a percentage of the rail-freight transport base rate and by agreeing upon common indices, timing, and trigger points for adjusting the percentages. Although the purported purpose of a Rail Fuel Surcharge is to allow recovery by a railroad of an unanticipated fuel cost increase, Defendants, by working in concert, were able to use Rail Fuel Surcharges as revenue generators and profit centers.

5.     The manner in which Defendants set their Rail Fuel Surcharges was both arbitrary, because numerous other mechanisms were available, and flawed, because other available mechanisms were superior means of recovering unanticipated fuel costs as opposed to simply inflating profits. Defendants would not have naturally made the arbitrary choices they did if they had acted unilaterally. Without working in concert, Defendants would not have been able to set and maintain their Rail Fuel Surcharges at their inflated levels.

6.     During the Class Period, some industry analysts observed the "convergence" in the Rail Fuel Surcharge methodologies adopted by Defendants and found this phenomenon

puzzling given the flaws in the methodologies adopted and the fact that the independent adoption of these methodologies would not be in each railroad's self interest.  For example, after completing a study in 2003 concluding that Rail Fuel Surcharges charged by Defendants were "not supported" by fuel cost increases, one industry analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives."  This was confounding because "the way to gain significant market share is to lead the competition rather than following the competition."  The fact that Defendants were working in concert, and not unilaterally, explains their behavior.

7.      Defendants published their Rail Fuel Surcharges on their websites to facilitate signaling, coordination, and the detection of any deviation from collusive pricing.  At the same time, Defendants did not provide information to their customers that would enable them to evaluate the extent to which Rail Fuel Surcharges related to unanticipated fuel costs.

8.      As a direct and proximate result of this price-fixing conspiracy, Defendants have restrained competition among unregulated rail freight transportation services and injured Plaintiff and the members of the Class in their business and property.  Plaintiff, and the other members of the Class, paid a higher price for unregulated rail freight transportation than would have been paid absent the concerted unlawful activity alleged herein.

## PARTIES

9.      Dad's Products Company, Inc. ("Dad's Products") is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business at 18746 Mill Street, Meadville, Pennsylvania, 16335.  During the Class Period, Dad's Products purchased unregulated rail freight transportation directly from one or more of the Defendants and was assessed a Rail Fuel Surcharge in connection with that purchase.

10.     Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. In Chicago, BNSF operates BNSF Logistics Park, which serves as the national center for the company's logistics services. BNSF maintains major intermodal hubs at Logistics Park and Corwith Yard, Chicago. In 2006, these sites represented, respectively, BNSF's third and second largest facilities in terms of lift volume. (Four of BNSF`s top ten intermodal hubs are located in Illinois.) BNSF also operates and serves rail terminals in Cicero and Hodgkins, Illinois. BNSF is a wholly owned subsidiary of the Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation. BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the Western United States, extending into the Southeastern states.

11.     Defendant CSX Transportation, Inc., ("CSX") has its principal place of business at 500 Water Street, Jacksonville, Florida, 32202. CSX maintains an operation center in Calumet City, Illinois and major rail yards in Chicago, Riverdale, and Bedford Park. CSX has railway lines throughout the Eastern United States. In Illinois, CSX maintains more than 1,000 miles of track and employs more than 1,000 of the State's residents.

12.     Defendant Kansas City Southern Railway Company ("KCSR") has its principal place of business at 427 West 12th Street, Kansas City, Missouri, 64105. KCSR originates and terminates traffic in this District by providing rail transportation in interchange service with BNSF and the Iowa, Chicago & Eastern Railroad Company. KCSR owns and operates major freight railroad in ten midwestern and southern states, including Illinois.

13.    Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia, 23510. NS maintains an intermodal operations center at 7600 South Western Avenue, Chicago, Illinois, 60620 and operates and serves rail terminals in Chicago. NS's network of tracks includes more than 21,000 route miles in 22 states in the Eastern US and in Ontario, Canada. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world.

14.    Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska, 68179. UP maintains a regional office in Chicago at 436 West 25th Place, Chicago, Illinois, 60616, which also houses its Vice President of governmental affairs. UP operates major terminals in Chicago, Rochelle, Dolton, and Northlake, through which it originates and terminates rail traffic. UP owns the Belt Railway Company of Chicago, and the Chicago Southshore and South Bend Railroad (both located in Chicago), and operates four intermodal facilities in Illinois. According to the company's website, "Illinois is a key state for Union Pacific Railroad," as main-line tracks from southern Illinois and St. Louis enter Chicago from the south, and UP's east-west transcontinental line across Illinois terminates at the company's Proviso Yard in Northlake. UP operates 2,247 miles of track in Illinois and employs more than 4,000 of the State's residents. UP serves primarily the western two-thirds of the US and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country.

15.    Chicago is the only city where the major US and Canadian Class I railroads come together to interchange freight. Annually, rail freight with a value of approximately $350 billion moves through Chicago. Freight railroads in Chicago own 74 marshalling yards, including 17 for rail-truck intermodal traffic, and operate an estimated 1,200 daily trains. Due to its position

as the nation's most important rail crossroads, major rail flows move between Chicago and all regions of the US.

## JURISDICTION AND VENUE

16.     This action is brought under Section 4 of the Clayton Act, 15 U.S.C. §15, to recover treble damages and reasonable attorneys fees from Defendants for the injuries sustained by Plaintiff and members of the Class by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

17.     Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C.§§ 1331 and 1337.

18.     Venue is proper in this District pursuant to 15 U.S.C. §15(a) and 22 and 28 U.S.C. §1391. Defendants maintain offices, have agents, transact business, and are found within this judicial District; a substantial part of the events giving rise to the claims for relief occurred in this District; and Defendants regularly and continuously conduct business in interstate commerce that is carried out in part in this District.

19.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action as a class action under Rules 23(a) and (b)(3) of the

Federal Rules of Civil Procedure, on behalf of itself and others similarly situated.  The "Class" is

defined as:

> All purchasers of rail freight transportation services from
> Defendants, through use of private railroad-shippers contracts or
> through other means exempt from rate regulation under federal
> law, as to which Defendants assessed a Rail Fuel Surcharge, at any
> time from at least as early as July 1, 2003 to the present (the "Class
> Period").  Excluded from the Class are Defendants, any
> subsidiaries or affiliates of Defendants, any of Defendants' co-
> conspirators, whether or not named in this Complaint, and
> governmental entities (the "Class").

21.     Because such information is in the exclusive control of Defendants, the exact

number of Class members is unknown to Plaintiff as this time.  Due to the nature and magnitude

of the trade and commerce involved, however, Plaintiff believes that the members of the Class

number, at least, in the thousands and are geographically dispersed throughout the United States

so that joinder of all class members would be impracticable.  Plaintiff further believes the

members of the Class can be readily ascertained from Defendants' books and records.

22.     Plaintiff's claims are typical of the claims of the other members of the Class.

Plaintiff and all members of the Class directly purchased unregulated rail freight transportation

from Defendants, with respect to which Defendants imposed the artificially inflated Rail Fuel

Surcharges established and maintained by the actions of Defendants in connection with the

restraint of trade alleged herein.

23.     Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in class action and antitrust litigation.

24.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a.     whether Defendants conspired, contracted, and/or combined with others, for the purpose or with the effect of raising, fixing, maintaining, or stabilizing the price of Rail Fuel Surcharges applied to unregulated rail freight transportation services purchased by the Class;

b.     the duration of the conspiracy, contract, or combination alleged in this Complaint;

c.     the nature and character of the acts performed by Defendants in furtherance of the conspiracy, contract, or combination;

d.     whether Defendants' conduct violated the federal antitrust laws; and

e.     whether Defendants' conduct caused injury to the business and property of Plaintiff and the Class and, if so, the proper measure of damages.

25.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would also impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

26.     The Class has a strong and pervasive community of interest, and prosecution of the action through representatives would be unobjectionable.  The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants.  No difficulty is anticipated in the management of this action as a class action.

## INTERSTATE TRADE AND COMMERCE

27.     During the Class Period, Defendants accounted for over 90 percent of all rail shipments within the United States.  The US market for rail transportation services was estimated at more than $51 billion in 2006.

28.     The activities of Defendants were within the flow of, and substantially affected, interstate and international commerce.  During the Class Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States.  Each Defendant used instrumentalities of interstate or foreign commerce (or both) to sell and market rail freight transportation services.

29.     The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

## BACKGROUND

### Deregulation of the Railroad Industry

30.     Over 25 years ago, Congress transformed federal regulation of the railroad industry.  After almost 100 years of economic regulation, the railroad industry was in serious economic trouble in the 1970s, with rising costs, losses, and bankruptcies.  In response, Congress passed the Railroad Revitalization and Regulatory Reform Act of 1976 and the Staggers Rail Act of 1980 ("Staggers Act").

31.     Together, these pieces of legislation substantially deregulated the railroad industry.  In particular, the Staggers Act encouraged greater reliance on competition to set rates and gave railroads increased freedom to price their services according to market conditions. These acts also allowed railroads and shippers to enter into contracts that set rates and prohibited the Interstate Commerce Commission ("ICC"), and later the Surface Transportation Board ("STB"), from regulating rates where railroads had either effective competition or rates negotiated between the railroad and the shipper.  At the same time, the Staggers Act anticipated that some shippers might not have competitive alternatives – commonly referred to as "captive shippers" – and the ICC (later the STB) was given the authority to establish a process whereby captive shippers could obtain relief from unreasonably high rates.  (The ICC Termination Act of 1996 abolished the ICC and transferred its regulatory functions to the STB.)

32.     Today 80 percent or more of all rail shipments are exempt from rate regulation or move under private transportation contracts, which are likewise free of rate regulation.

### Railroad Consolidation

33.     During the past 30 years, the freight railroad industry has become significantly more concentrated.  In 1976, there were 30 independent Class I railroad systems, consisting of 63 Class I railroads, operating in the United States.  Currently, there are seven Class I railroads (two of which are owned by Canadian entities).  (As of 2004, a Class I railroad is any railroad with operating revenue over $277.7 million.)  Nearly half of that reduction was attributable to consolidations.

34.     By the early 2000's, the industry had consolidated to the point where further mergers were unlikely, if not impossible.  In response to the proposed Burlington Northern Santa

Fe ("BNSF") and Canadian National Railway Co. ("CN") merger, the STB placed a moratorium on new mergers and promulgated more stringent standards for merger review.

## Defendants Introduce Fuel Surcharges

35.     Following deregulation, railroad rates declined for a time. Railroad rates generally declined between 1985 and 2001, but they began to increase in 2001 and increases continued through 2006. During the period of rate increases, Defendants also began shifting certain costs to shippers, including by introducing Rail Fuel Surcharges. As further explained below, this has allowed Defendants to coordinate rate increases, through the guise of surcharges which are purported to be related to cost recovery.

36.     After passage of the Staggers Act in 1980, railroads began entering into transportation contracts with cost escalation provisions often tied to the "Rail Cost Adjustment Factor" ("RCAF"). The RCAF was published by the Association of American Railroads ("AAR"), the industry trade association, and included fuel prices as a component of the cost escalation. In the fourth quarter of 2002, the AAR – which is controlled by the Class I railroads (*i.e.* the Defendants) – published, for the first time, a RCAF without a fuel component. This decision to remove fuel costs from the RCAF index facilitated Defendants' ability to begin assessing separate Rail Fuel Surcharges and coordinating that practice.

37.     Following publication of the RCAF index without fuel, or the "All-Inclusive Index Less Fuel" ("All-LF"), Defendants began to apply a Rail Fuel Surcharge as a separate item on a shipper's bill. When the price of oil began to rise in late 2003 and early 2004, Defendants saw that they could use monthly changes to the fuel surcharge as an easy way to increase their revenues without having to renegotiate individual contracts or wait for new rail capacity to come on line – so long as all Defendants participated and did not undercut each other.

## DEFENDANTS' PRICE-FIXING CONSPIRACY

38.     Commencing in or about July, 2003 or earlier, Defendants agreed to begin coordinating the prices they charged rail shippers and customers for carload shipments.  The key element of this price-fixing conspiracy was an agreement by Defendants to act in concert with one another in demanding Rail Fuel Surcharges from rail shippers and customers and by agreeing to compute Rail Fuel Surcharges as a percentage of the base rail-freight rate paid by customers (*i.e.,* revenue).

39.     Such a "revenue-based" fuel surcharge bears no direct relationship to Defendants' actual increase in fuel costs.  This is in part because railroads rely on differential pricing, under which rates are dependent on factors other than cost.  Thus, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied.  Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate, it will pay dramatically more in fuel surcharges.  Indeed, Defendants have acknowledged that their fuel surcharge program is not a cost recovery mechanism, but a revenue enhancement measure intended to achieve across-the-board increases in the prices charged by Defendants for unregulated rail freight transportation.

40.     Defendants implemented their agreement by exchanging information both in private and by publicly announcing agreed-upon surcharge increases and posting the monthly fuel surcharge percentages on their websites.  This was done for purposes of monitoring and enforcing the agreed-upon Rail Fuel Surcharge levels.  At the same time, Defendants did not provide to their customers information that would enable the customers to determine the relationship between the Rail Fuel Surcharges and Defendants' unanticipated fuel cost increases.

41.    As a result of Defendants' concerted action, prices of Rail Fuel Surcharges charged to rail shippers and customers (members of the Class) were raised to or maintained at supracompetitive levels throughout the Class Period.

42.    On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for regulated rail freight transport was an "unreasonable practice," because, *inter alia*, the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007).

43.    The STB also found that the railroads had been "double dipping" – applying to the same traffic both a fuel surcharge and a rate increase that is based on the RCAF or another index that includes a fuel cost component. The STB ordered Defendants to change these practices. The STB's decision addressed rate regulated rail freight traffic only (which is not the subject of this Complaint). The STB stated that its decision does not apply to rail freight traffic under contract or otherwise exempted from rate regulation.

44.    Defendants applied the same unreasonable fuel surcharge practices to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

## ELEMENTS OF THE PRICE-FIXING CONSPIRACY

45.    Defendants' conspiracy involved an agreement to employ Rail Fuel Surcharges not as a cost recovery mechanism for the transportation to which the surcharge was applied, but as a multiplier percentage of the base rate charged for the rail freight transportation involved.

46.    Defendants began to implement their conspiracy at least as early as June, 2003 when the two western railroads, BNSF and UP (the "Western Railroads"), agreed to coordinate

their prices relative to Rail Fuel Surcharges. Prior to this time, the UP carload fuel surcharge was adjusted monthly based on the West Texas Intermediate Crude Oil Index (the "WTI Index"). The BNSF carload fuel surcharge was based on the US Department of Energy On-Highway Diesel Fuel Price Index (the "HDF Index"). In or about June, 2003, however, UP switched to the HDF Index pursuant to an agreement with BNSF. From that point on, the Western Railroads moved in lockstep and charged the *exact same* Rail Fuel Surcharge percentage for each month of the Class Period.

47.   The Western Railroads agreed to administer the HDF Index in precisely the same way. When the US average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied. When the HDF Index exceeded $1.35 per gallon, however, the Western Railroads both applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, the Western Railroads would apply a surcharge of 2 percent. The surcharge would increase 2 percent for every 20 cents increased in the HDF Index.

48.   The Western Railroads also coordinated when they would change their Rail Fuel Surcharge. They agreed that the surcharge would be applied to shipments beginning the second month after the month in which there was a change in the HDF average price calculation. For example, if the HDF Index average price changed in January, the Western Railroads would announce their new Rail Fuel Surcharge percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March. The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

49.     The choice to use the HDF Index for setting the fuel surcharge was arbitrary. Other indices exist, for example, that would potentially be more desirable to customers. The HDF Index price is essentially the average retail price paid at truck stops and service stations for diesel fuel, and it includes taxes. However, the Western Railroads buy their fuel in bulk, at wholesale not retail prices, and without having to pay certain taxes. These and other differences introduce a high level of variability in the fluctuations between the HDF Pricing Index and the Western Railroads' actual incremental fuel costs. For example, according to BNSF's investor reports, BNSF's average cost for diesel fuel in the third quarter rose by 14.4 percent from 2003 to 2004. In contrast, the average HDF Index price over the same period increased by 25.3 percent. Thus, under BNSF's fuel surcharge, BNSF shippers would have been forced to pay on an incremental basis almost double the increase BNSF actually incurred for its diesel fuel costs. Indeed, under the use of the HDF Index, Rail Fuel Surcharges can increase even when incremental fuel costs have not changed, or even when they have decreased – if non-fuel index costs increase.

50.     Also arbitrary was the decision by the Western Railroads to set the trigger point at $1.35 per gallon and to apply the surcharge in the second calendar month after the HDF average price had changed. The fact that the Western Railroads chose and adhered to the same index and the same combination of features for their Rail Fuel Surcharge programs is evidence that they coordinated their behavior. The similarities are too precise and too comprehensive to have been arrived at naturally and unilaterally.

51.     Using the HDF Index, the two Western Railroads moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

52.   The chart below shows that the Fuel Surcharge Percentages charged by the Western Railroads for carload shipments varied before the Class Period began, but were identical starting in July, 2003:

## MONTHLY SURCHARGE PERCENTAGES – WESTERN RAILROADS

| MONTH | BNSF | UP |
|---|---|---|
| Jun – 02 | 1 | 0 |
| Jul – 02 | 1 | 0 |
| Aug – 02 | 0 | 0 |
| Sep -02 | 0 | 0 |
| Oct – 02 | 1% | 0 |
| Nov – 02 | 2% | 0 |
| Dec – 02 | 2.5% | 0 |
| Jan – 03 | 2% | 2 |
| Feb-03 | 2% | 2 |
| Mar – 03 | 2.5% | 2 |
| Apr – 03 | 4.5% | 2 |
| May – 03 | 2% | 2 |
| Jun – 03 | 3.0% | 2.0% |
| **Jul – 03** | **2.5%** | **2.5%** |
| Aug – 03 | 2.0% | 2.0% |
| Sep – 03 | 2.5% | 2.0% |
| Oct – 03 | 2.5% | 2.5% |
| Nov – 03 | 2.5% | 2.5% |
| Dec – 03 | 2.5% | 2.5% |
| Jan – 04 | 2.5% | 2.5% |
| Feb – 04 | 2.5% | 2.5% |
| Mar – 04 | 3.5% | 3.5% |
| Apr -04 | 3.5% | 3.5% |
| May - 04 | 4.0% | 4.0% |
| Jun – 04 | 4.5% | 4.5% |
| Jul - 04 | 5.0% | 5.0% |
| Aug – 04 | 5.0% | 5.0% |
| Sep – 04 | 5.0% | 5.0% |
| Oct - 04 | 6.0% | 6.0% |
| Nov – 04 | 7.0% | 7.0% |
| Dec – 04 | 9.0% | 9.0% |
| Jan – 05 | 9.0% | 9.0% |
| Feb – 05 | 8.0% | 8.0% |
| Mar – 05 | 7.5% | 7.5% |
| Apr – 05 | 8.0% | 8.0% |

| | | |
|---|---|---|
| May – 05 | 10.0% | 10.0% |
| Jun – 05 | 10.5% | 10.5% |
| Jul – 05 | 9.5% | 9.5% |
| Aug – 05 | 10.5% | 10.5% |
| Sep – 05 | 11.5% | 11.5% |
| Oct – 05 | 13.0% | 13.0% |
| Nov – 05 | 16.0% | 16.0% |
| Dec – 05 | 18.5% | 18.5% |
| Jan – 06 | 13.5% | 13.5% |
| Feb – 06 | 12.0% | 12.5% |
| Mar – 06 | 12.5% | 12.5% |
| Apr – 06 | 12.5% | 12.5% |
| May – 06 | 13.5% | 13.5% |
| Jun – 06 | 15.0% | 15.0% |
| Jul – 06 | 16.5% | 16.5% |
| Aug – 06 | 16.5% | 16.5% |
| Sep – 06 | 17.0% | 17.0% |
| Oct – 06 | 18.0% | 18.0% |
| Nov – 06 | 15.5% | 15.5% |
| Dec – 06 | 13.0% | 13.0% |
| Jan – 07 | 13.0% | 13.0% |
| Feb – 07 | 14.0% | 14.0% |
| Mar – 07 | 12.5% | 12.5% |

53.     Defendants CSX and NS, located in the East, began to implement the conspiracy in February, 2004 or earlier.  Defendant KCSR, located in the Midwest, agreed to join the conspiracy in June, 2005 or earlier.  (Defendants CSX, NS, and KCSR collectively are the "Eastern Railroads").  The Eastern Railroads all agreed to base their fuel surcharge programs on the average monthly price of WTI as published in the *Wall Street Journal*.  Indeed, not only did these railroads all agree to use the WTI Index (as opposed to many other available indices), once they joined the conspiracy, they too agreed to administer the index in precisely the same way.

54.     Specifically, after an initial period in which their selected WTI trigger price differed, the Eastern Railroads agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel.  When that happened, Defendants' rates were increased 0.4 percent for every $1 dollar that the price of WTI oil exceeded $23 per barrel.  So, for example, if

the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The Rail Fuel surcharge would be adjusted upward at 2 percent for every $5 increase in the WTI average price.

55.     The Eastern Railroads also coordinated when they would change their fuel surcharge – two calendar months after the WTI index had adjusted – thereby adopting the same timing used by the Western Railroads. For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March. In this way, Defendants could apply the exact same fuel surcharge percentage month after month. The Eastern Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

56.     The choice to use the WTI Index for fuel surcharges was arbitrary. Also arbitrary was the decision to set the trigger point at $23 per barrel and to apply the surcharge in the second calendar month after the average price of WTI oil had changed. The fact that Defendants CSX, NS, and KCSR all chose and adhered to this same combination of features for their Rail Fuel Surcharge programs indicates that they coordinated their behavior. The similarities are too precise and too comprehensive to have been arrived at naturally and unilaterally.

57.     The net result is that there was uniformity among the Eastern Railroads in the monthly surcharge percentages they charged customers for most of the Class Period. Although KCSR used different fuel surcharge percentages for certain months of the Class Period, in June, 2005 it adopted the same fuel surcharge percentage used by CSX and NS and moved in lock step with them for the remainder of the Class Period. KCSR has different operations and fuel

consumption patterns from the larger US railroads, making it unlikely that KCSR would adopt

the same fuel surcharge percentages as the other railroads absent concerted conduct.

58.    The chart below shows that the Fuel Surcharge Percentages charged by

Defendants CSX and NS for carload shipments varied before the Class Period, but were identical

starting in February, 2004, and they also were identical to those of the KCSR starting in June,

2005, when KCSR joined the conspiracy:

### MONTHLY SURCHARGE PERCENTAGES – EASTERN RAILROADS

| MONTH | CSX | NS | KCSR |
|-------|-----|-----|------|
| Jun – 03 | 2.4% | 2% | |
| Jul – 03 | 2.4% | 2% | |
| Aug – 03 | 3.2% | 2% | |
| Sep – 03 | 3.2% | 2% | |
| Oct – 03 | 3.6% | 2% | |
| Nov – 03 | 2.4% | 2.0% | |
| Dec – 03 | 3.2% | 2.0% | |
| Jan – 04 | 3.6% | 2.0% | |
| Feb – 04 | 4.0% | 2% | |
| **Mar – 04** | **4.8%** | **4.8%** | |
| Apr -04 | 4.8% | 4.8% | |
| May - 04 | 5.6% | 5.6% | |
| Jun – 04 | 5.6% | 5.6% | |
| Jul - 04 | 7.2% | 7.2% | |
| Aug - 04 | 6.4% | 6.4% | |
| Sep – 04 | 7.2% | 7.2% | |
| Oct - 04 | 8.8% | 8.8% | |
| Nov – 04 | 9.2% | 9.2% | |
| Dec – 04 | 12.4% | 12.4% | 10.0% |
| Jan – 05 | 10.4% | 10.4% | 10.0% |
| Feb – 05 | 8.4% | 8.4% | 10.0% |
| Mar – 05 | 9.5% | 9.5% | 10.0% |
| Apr – 05 | 10.0% | 10.0% | 10.0% |
| May – 05 | 12.8% | 12.8% | 10.0% |
| **Jun – 05** | **12.4%** | **12.4%** | **12.4%** |
| Jul – 05 | 10.8% | 10.8% | 10.8% |
| Aug – 05 | 13.6% | 13.6% | 13.6% |
| Sep – 05 | 14.4% | 14.4% | 14.4% |
| Oct – 05 | 16.8% | 16.8% | 16.8% |

| | | | |
|---|---|---|---|
| Nov – 05 | 17.2% | 17.2% | 17.2% |
| Dec – 05 | 16.0% | 16.0% | 16.0% |
| Jan – 06 | 14.4% | 14.4% | 14.4% |
| Feb – 06 | 14.8% | 14.8% | 14.8% |
| Mar – 06 | 17.2% | 17.2% | 17.2% |
| Apr – 06 | 15.6% | 15.6% | 15.6% |
| May – 06 | 16.0% | 16.0% | 16.0% |
| Jun – 06 | 18.8% | 18.8% | 18.8% |
| Jul – 06 | 19.2% | 19.2% | 19.2% |
| Aug – 06 | 19.2% | 19.2% | 19.2% |
| Sep – 06 | 20.8% | 20.8% | 20.8% |
| Oct – 06 | 20.4% | 20.4% | 20.4% |
| Nov – 06 | 16.4% | 16.4% | 16.4% |
| Dec – 06 | 14.4% | 14.4% | 14.4% |
| Jan – 07 | 14.8% | 14.8% | 14.8% |
| Feb – 07 | 16.0% | 16.0% | 16.0% |
| Mar – 07 | 12.8% | 12.8% | 12.8% |

59.     In contrast to this uniformity in fuel surcharge percentages, fuel cost as a percentage of operating cost and fuel efficiency differs widely among the Defendant railroads. Absent collusion, it is extremely unlikely that Defendants, in both the East and the West, would naturally and unilaterally price their Rail Fuel Surcharges to arrive at the identical percentage month after month, year after year, for a period of more than three years. The fact that Defendants moved in uniform lockstep for a period of nearly 38 months – in the face of significant shipper opposition – indicates that Defendants were coordinating their behavior in order to thwart competition and that they conspired to fix prices for Rail Fuel Surcharges. In a competitive environment, free of collusion, carriers with lower fuel costs would impose a lower surcharge to obtain a competitive advantage.

60.     As some industry analysts observed, Defendants conduct is "puzzling" or "surprising," to say the least, if viewed as unilateral conduct. Since "the way to gain significant market share is to lead rather than follow the competition," one industry analyst noted in 2003, "I was puzzled by the fact that the railroads appear to be matching fuel surcharges rather than

-20-

developing their own pricing initiatives."   Similarly, an economic consulting firm examining the industry in 2006, found it "suprising[]" that "Class I Railroads have each adopted Fuel Surcharge designs which share the same flawed structure of applying a cost increase to revenue."  The explanation is that Defendants' conduct was not unilateral conduct, but concerted action designed to reap inflated profits by sabotaging competition.

## ADDITIONAL EVIDENCE OF A CONSPIRACY

61.     Apart from this direct evidence of price fixing, "plus factors" further support the allegation that Defendants agreed to fix prices for Rail Fuel Surcharges.  The rail transportation industry is marked by certain structural and other characteristics that made Defendants' price-fixing cartel feasible:

(a)     As discussed above, the railroad industry is highly concentrated.  Defendants in this case are the five remaining domestic Class I railroads following decades of mergers and consolidation.  Defendants account for well over 90 percent of the nation's rail traffic.

(b)     There are significant barriers to entry into the railroad industry.  To enter, railroads must invest in a vast network of tracks, stations, yards, and switching facilities.  These may take decades to develop and require onerous regulatory and environmental reviews and approval.  Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of eminent domain power.  Because rail infrastructure is of minimal value for other purposes, and rail networks are difficult to assemble, fixed costs are largely sunk.  Successful entry also requires that a new entrant capture a significant market share from existing carriers.  Entry is thus both expensive and risky.

(c)     Rail Fuel Surcharges, as employed by Defendants, are highly standardized.  Defendants structured their Rail Fuel Surcharges as a percentage of base rates and then published

the percentages on their websites so they could police their concerted conduct effectively and without frequent communications.

(d)     The railroad industry has a history of price fixing and other anticompetitive behavior.  In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass'n,* 166 U.S. 290 (1897), the railroad cartel argued that it must price fix or the industry would go bankrupt.  Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate making committees."  Although these bodies have disappeared from the rail industry in the wake of the Staggers Act, the railroad industry has continued to engage in market manipulation, unreasonable rate practices, and other discriminatory practices against a wide spectrum of freight customers.

(e)     Defendants' Chief Executive Officers are board members of the AAR, the industry's trade association, which facilitates collusion and transfer of pricing information.  The AAR describes itself as "the central coordinating and research agency of the North American rail industry."  Full membership, however, is available only to the seven Class I railroads operating in the United States, the five most significant of which are Defendants here (the other two Class I railroads are owned by Canadian companies).  The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

62.     Apart from these structural market features, Defendants did not behave as if they were in a competitive market.  Shippers from many different industries, some with significant economic power, tried to negotiate fuel surcharge percentages, but were told by Defendants that the Rail Fuel Surcharges were "not negotiable."

63.     National shippers organizations met with each of the Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges.  Among the Defendants, only BNSF agreed to make responsive changes to its surcharge program, and that was only for grain and coal shipments coming from certain regions where the BNSF is the only carrier.  The other Defendants refused to address the concerns of their customers.

64.     At or about the time Defendants agreed to fix the Rail Fuel Surcharges, they largely switched from offering long-term contracts to offering contracts that were "re-priced" in new negotiations semi-annually, quarterly, or monthly.  Previously, Defendants had allowed, and often preferred, long-term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point or that excluded fuel surcharges altogether.

65.     Defendants made this switch even though most shippers preferred the former system in order to minimize risk.  In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business.  Here, all Defendants raised prices and did not offer any compensation to customers for assuming additional risk.

66.     Defendants sometimes stopped offering "through rates," in which a shipper would receive a single bill from either the originating shipper or the termination railroad and a single fee would be allocated among the railroads that shipped.  Instead, Defendants moved to what is known in the industry as "Rule 11 pricing."  Under Rule 11 pricing, where a shipment requires movement on more than one carrier, the two rates are stated separately rather than as one quote for the entire shipment.  Defendants made this change as part of their conspiracy for two reasons:

to provide transparency as to what each railroad was charging on multiple line shipments and to allow each railroad to apply the agreed-upon Rail Fuel Surcharge in its own territory.

67.     Finally, demand for rail freight transportation services grew substantially during the period of the conspiracy, and yet Defendants' market shares remained relatively stable and constant.  The fact that market shares did not fluctuate significantly during the Class Period is further indication that Defendants agreed to collude rather than to compete for new sales.

## DEFENDANTS PROFITED FROM THE SURCHARGES

68.     As discussed, since the beginning of the Class Period and before, Defendants have used the Rail Fuel Surcharge not as a cost recovery mechanism, but as a revenue enhancement measure.  By computing the Rail Fuel Surcharge as a percentage of the base rate charged to the shipper, Defendants ensured that there would not be real correlation between the rate increase and the increase in fuel costs for the particular shipment to which the surcharge is applied.

69.     The ratio of Defendants' profits to their actual fuel costs was high as a result of the concerted implementation and maintenance of the agreed-upon Rail Fuel Surcharge. Through these Rail Fuel Surcharges, Defendants have realized billions of dollars in revenues during the Class Period in excess of their actual increase in fuel costs from the specific customers on whom they imposed the surcharge.

## ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

70.     The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

a.     the Rail Fuel Surcharges charged to Plaintiff and the Class for unregulated rail freight transportation have been fixed or stabilized at supracompetitive levels;

b.     Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for unregulated rail freight transportation; and

c.     competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed, and eliminated.

71.     By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff and the members of the Class have sustained injury to their business or property.  The injury sustained by Plaintiff and the Class is the payment of supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged.  This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

## COUNT I

### (Violations Of § 1 Of The Sherman Act And § 4 Of The Clayton Act)

72.     Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

73.     Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

74.     The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation.  Such contract,

combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is an unreasonable and unlawful restraint of trade.

75.     Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was accomplished through mutual understandings or agreements by, between, and among Defendants.

76.     The contract, combination, or conspiracy has had the following effects:

a.      prices charged to Plaintiff and the Class for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supra-competitive levels;

b.      Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services; and

c.      competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed, and eliminated.

77.     As a proximate result of Defendants' unlawful conduct, Plaintiff and the Class have suffered injury in that they have paid supracompetitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation services during the Class Period.

WHEREFORE, Plaintiff prays for relief as follows:

(1)     That the Court determine that this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be denominated as a Class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

(2)   That the unlawful contract, combination, and conspiracy alleged in Count 1 be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(3)   That Plaintiff and the Class recover treble damages, as provided by law;

(4)   That Plaintiff and the Class recover their costs of the suit, including attorney's fees, as provided by law; and

(5)   For such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(e) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: May __25__, 2007                           Respectfully submitted,

Carol V. Gilden
**Cohen, Milstein, Hausfeld & Toll, P.L.L.C.**
39 S. LaSalle Street, Suite 1100
Chicago, Illinois 60603
Tel:  312-357-0370
Fax:  312-357-0369

Michael D. Hausfeld
Benjamin D. Brown
**Cohen, Milstein, Hausfeld & Toll. P.L.L.C.**
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005
Tel:  202-408-4600
Fax:  202-408-4669

Steig D. Olson
**Cohen, Milstein, Hausfeld & Toll, P.L.L.C.**
150 East 52nd Street, Thirtieth Floor
New York, N.Y. 10022
Tel:  212-838-7797
Fax:  212-838-7745

Arthur N. Bailey
**Arthur N. Bailey & Associates**
111 West Second Street, Suite 4500
Jamestown, N.Y. 14701
716-664-2967
716-664-2983

*Attorneys for Plaintiff*